CLARK ROBINSON GRIGGS, Appellant, v. MELVILLE C. DAY and DANIEL E. GARRISON, as Surviving Executors of CORNELIUS K. GARRISON, Deceased, Respondents.

1. APPEAL — REVERSAL STATED TO BE UPON LAW AND FACTS — QUESTION OF LAW. If, on appeal from a judgment of reversal of the Appellate Division stating that the reversal was upon the law and the facts, an inspection of the record discloses that the facts underlying the conclusions in controversy are conceded or are not controverted, a question of law for the Court of Appeals arises as to the judgment that should be given thereon.

2. PROMISSORY NOTES OF NEW RAILROAD COMPANY — VALUE. Promissory notes issued by a railroad company to its contractor on taking over the completed road from him, and transferred by him to the holder of a majority of the stock, as collateral security for advances made by him to the contractor on behalf of the company, are not to be deemed to have been of no value when issued, even if the company was then insolvent, where by the law of the company's state the stockholders were liable for the debts of the corporation to an amount equal to their stock.

3. DISPOSAL OF NOTES NOT A CONVERSION — ACCOUNTING. If a promoter and stockholder of a railroad company, holding, under such circumstances as to make them equitably his own, promissory notes issued by the company to its contractor and transferred by him to the promoter as collateral security for advances made by the latter to the contractor on behalf of the company and for which it is liable, purchases bonds of the company and pays therefor with part of the notes, and surrenders the remaining notes to the company and causes them to be canceled, charging it with the amount, such action does not constitute a conversion of the notes and so prevent a recovery therefor by the contractor without showing their actual value, but the legal effect of the transaction is an acceptance by the promoter of the company's liability to pay his claim, and to relieve

1

the contractor of any further liability to him growing out of the advances for which the notes were given; and on an accounting between them the contractor is to be credited with the face value of the notes.

4. PLEDGED RAILROAD STOCK RETAINED FROM OWNER — REORGANIZATION OF COMPANY. Where such contractor has transferred to the promoter of the railroad, as collateral security for advances, stock of the road as well as its notes, and the secured indebtedness has been, in legal effect, paid by means of the notes, so that the promoter had no longer a right to retain the stock, but it is retained by him during his lifetime, and after his death his executors retain it and so convert it to their own use, thereby preventing the contractor from entering a reorganization of the company and making use of his stock for that purpose, they are estopped from claiming that the contractor would not have availed himself of the privilege had his stock been returned to him.

5. DAMAGES FOR DEPRIVATION OF STOCK. Where the promoter's executors have been allowed to purchase the railroad property, on foreclosure for reorganization, after the plan of reorganization had been adopted and made public, no complaint with reference thereto can be entertained as the basis of the contractor's right to recover damages on account of his stock, but his right of recovery therefor is limited to the damages which he actually sustained in being deprived of his stock.

6. ABSENCE OF EVIDENCE OF VALUE OF CONVERTED CORPORATE STOCK. When in such a case of the conversion of corporate stock by the pledgee, acting in good faith and under an honest mistake, there is no evidence upon which the value of the stock can properly be determined within a reasonable time after its conversion and notice to the owner, and the owner fails to show that the stock had a value during that period, it is to be inferred that it was of but little or no value.

*Griggs* v. *Day*, 21 App. Div. 442, reversed.

(Argued December 8, 1898; decided January 10, 1899.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered December 24, 1897, reversing a judgment in favor of plaintiff entered upon the report of a referee, and dismissing the plaintiff's complaint, with costs.

The nature of the action and the facts, so far as material, are stated in the opinion.

*David B. Hill, Joseph H. Choate, John H. Post* and *Samuel E. Heasley* for appellant. The act of the Appellate Division in dismissing the plaintiff's complaint and rendering

judgment absolute against him was unauthorized and erroneous. (*Heller* v. *Cohen*, 154 N. Y. 299; *Benedict* v. *Arnoux*, 154 N. Y. 715; *Schwinger* v. *Raymond*, 83 N. Y. 193; *Bonnell* v. *Griswold*, 89 N. Y. 122; *Redfield* v. *Redfield*, 110 N. Y. 671; *Green* v. *Roworth*, 113 N. Y. 467; *Kummer* v. *C. & T. S. R. R. Co.*, 14 Misc. Rep. 507; *McCall* v. *Moschowitz*, 1 N. Y. S. R. 100; *Amherst College* v. *Ritch*, 151 N. Y. 320.) The Appellate Division had no jurisdiction to reverse the referee upon the facts. (*Otten* v. *M. R. Co.*, 150 N. Y. 395; *Benedict* v. *Arnoux*, 154 N. Y. 715; *Ball* v. *Loomis*, 29 N. Y. 412; Code Civ. Pro. § 1022; *Amherst College* v. *Ritch*, 151 N. Y. 282; *People ex rel.* v. *Barker*, 152 N. Y. 417; *M. L. Ins. Co.* v. *Schaefer*, 16 Misc. Rep. 625; *Wolf* v. *G. F. Ins. Co.*, 43 Barb. 400; *Heritage* v. *Hall*, 33 Barb. 347; *Beckwith* v. *N. Y. C. R. R. Co.*, 64 Barb. 299; *Cohen* v. *Dupont*, 1 Sandf. 260.) The referee rightly decided, as shown in his opinion, that all the issues were before him for determination upon this trial, save only as he might be controlled by the decision of this court upon the single point on which it reversed the former judgment, and that point was completely obviated by the new evidence introduced and the different state of facts established upon the present trial. (2 Rumsey's Practice, 423, 424; *Crim* v. *Starkweather*, 32 Hun, 350; 98 N. Y. 653; *Ripowam Co.* v. *Strong*, 2 Hilt. 52; Hilliard on New Trials, 73; *Griggs* v. *Day*, 29 J. & S. 124; *F. Nat. Bank* v. *N. P. Co.*, 119 N. Y. 256.) The case as tried before Referee Abbott and presented by the record now before the court, is in numerous essential features thereof different from that which was before this court upon the former appeal and rests, in material respects, upon new evidence which was not adduced upon the former trial. (*Larkin* v. *Hardenbrook*, 90 N. Y. 333; *Beach* v. *Endress*, 51 Barb. 578; *Griggs* v. *Day*, 29 J. & S. 124; 137 N. Y. 542; Code Civ. Pro. §§ 1337, 1338; *Ostrander* v. *Hart*, 130 N. Y. 406; *Ryan* v. *Mayor, etc.*, 7 App. Div. 336; *Mygatt* v. *Coe*, 142 N. Y. 78; *Roberts* v. *Buckley*, 145 N. Y. 215; *James* v.

*Cowing*, 82 N. Y. 449 ; *King* v. *Townshend*, 141 N. Y. 358.) The referee's decision discloses no error in the processes by which he reached his conclusions, and, therefore, the defendants' exception thereto does not furnish any basis for a reversal of the judgment directed by him. (*West* v. *Van Tuyl*, 119 N. Y. 620 ; *Heye* v. *Tilford*, 2 App. Div. 346 ; *Carey* v. *Smith*, 5 App. Div. 505 ; *Suhrada* v. *T. A. R. R. Co.*, 14 App. Div. 361.) The defendants have only one substantial ground of defense, and that has been overruled upon all the trials and by all the appellate courts. (*Griggs* v. *Day*, 26 J. & S. 385 ; 29 J. & S. 124 ; *Ferguson* v. *Gill*, 74 Hun, 566 ; *Cole* v. *F. B. C. Co.*, 87 Hun, 584 ; *Kummer* v. *C. & T. S. R. R. Co.*, 14 Misc. Rep. 507 ; *McCall* v. *Moschowitz*, 1 N. Y. S. R. 100 ; *Amherst College* v. *Ritch*, 151 N. Y. 282.) The referee was right in allowing the plaintiff credit in the account for the item of $2,062,643.12, the face value, with interest, of the promissory notes given by the railroad company for moneys advanced by Garrison, through the plaintiff or paid directly to other persons, for the superior work not called for by the contract, and the work for which the company had agreed in the construction contract to provide means, and which the plaintiff was not bound by the contract to perform unless the company should provide the means therefor. (*Griggs* v. *Day*, 136 N. Y. 152 ; *Mygatt* v. *Coe*, 142 N. Y. 78 ; Edwards on Bailm. § 319 ; *Hawks* v. *Hinchcliff*, 17 Barb. 492 ; *F. Bank* v. *Blair*, 44 Barb. 641 ; 2 Daniels on Neg. Inst. §§ 1310, 1313 ; *Morris* v. *Harveys & Williams*, 75 Va. 726 ; *Larkin* v. *Hardenbrook*, 90 N. Y. 333 ; *Gage* v. *Punchard*, 6 Daly, 229 ; *Thayer* v. *Manley*, 73 N. Y. 305.) The referee was right in giving the plaintiff credit in the account for the item of $348,394.87, as the value of the stock of the said railroad company which the plaintiff assigned to Garrison on March 15, 1882, as collateral security. (Jones on Pledges, §§ 403, 405, 410 ; Edwards on Bailm. §§ 237, 296 ; *Wheeler* v. *Newbould*, 16 N. Y. 398 ; *Word* v. *Morgan*, 5 Sneed, 79 ; *Coggs* v. *Bernard*, 2 Ld. Raym. 909 ; *Mitchell* v. *Williams*, 4 Hill, 13 ; *Marvin* v. *U. L. Ins. Co.*, 85 N. Y.

278; *Murtha* v. *Curley*, 90 N. Y. 377; *Wakeman* v. *W. &
W. M. Co.*, 101 N. Y. 205; Code Civ. Pro. § 1207; *Baker*
v. *Drake*, 53 N. Y. 211; 66 id. 518; *Colt* v. *Owens*, 90 N.
Y. 368; *Minor* v. *Beveridge*, 141 N. Y. 399.)

*Elihu Root, Melville C. Day* and *William R. Bronk* for
respondents. The decision and judgment of the Appellate
Division, in reversing the judgment appealed from and ren-
dering a final judgment for the defendants, was within their
power as defined by sections 1022 and 1367 of the Code of
Civil Procedure, and that power upon the facts in this case
was rightly exercised. (*People* v. *Helmer*, 154 N. Y. 596;
*Benedict* v. *Arnoux*, 154 N. Y. 715; *Otten* v. *M. R. Co.*,
150 N. Y. 395; *Muldoon* v. *Pitt*, 54 N. Y. 269; *Fischer* v.
*Blank*, 138 N. Y. 669; *Price* v. *Price*, 33 Hun, 432; *Wood*
v. *Baker*, 60 Hun, 337; *Outwater* v. *Moore*, 124 N. Y. 66;
*Anderson* v. *Brewster*, 124 N. Y. 433.) Upon the conceded
and uncontroverted facts relating to the notes, the referee
was in error, and the decision of the Appellate Division is
unassailable. (*Mills* v. *Parkhurst*, 126 N. Y. 89; 23 Abb.
[N. C.] 145; 22 Abb. [N. C.] 269; *Levy* v. *James*, 49 Hun,
161; *Garrison* v. *Marie*, 7 Civ. Pro. Rep. 113; Bigelow on
Estoppel, 642; *Larue* v. *Rowland*, 7 Barb. 107; *Pendleton*
v. *Weed*, 17 N. Y. 72; Story on Prom. Notes, §§ 408, 410,
438; *Crawford* v. *Millspaugh*, 13 Johns. 87; Jones on
Pledges, § 718; Colebrooke on Col. Sec. § 15; *G. F. Ins. Co.*
v. *Marr*, 46 Penn. St. 504; *Hunter* v. *Moul*, 98 Penn. St.
13; *Burdick* v. *Green*, 15 Johns. 247; *Potter* v. *M. Bank*,
28 N. Y. 642.) The contention of the appellant, that this
court reversed the former judgment in favor of the plaintiff
on the sole ground that Garrison had converted the notes, and
that because the referee on the last trial found as a conclusion
of law that there had been no conversion of the $1,736,600 of
notes exchanged for second mortgage bonds, a new and dif-
ferent case is now presented, is wholly unsupported by the
record. (*Griggs* v. *Day*, 136 N. Y. 152; 137 N. Y. 542.)
The referee erred in charging defendants with $348,394.87,

with interest from April 16, 1887, on account of certain shares of the company's stock which were held by the defendants as collateral, and the decision of the Appellate Division on this item was correct upon the undisputed evidence in the case. (*Wright* v. *Bank of Metropolis*, 110 N. Y. 237.) The facts of the case not having been changed in any material respect by the so-called "new evidence" on the last trial from what they were on the record which was before this court on the former appeal of the defendants, that decision of this court should have controlled the referee on the last trial. (*Cluff* v. *Day*, 141 N. Y. 580; *W. S. Bank* v. *Solon*, 136 N. Y. 465; *Terry* v. *Wait*, 56 N. Y. 91; *Joslin* v. *Cowee*, 56 N. Y. 626; *Justice* v. *Lang*, 52 N. Y. 323; *Mygatt* v. *Coe*, 142 N. Y. 81; *Oakley* v. *Aspinwall*, 13 N. Y. 500.)

HAIGHT, J. This action was commenced in the late Superior Court of the city of New York on the 15th day of January, 1884, against Cornelius K. Garrison, who died on the first day of May, 1885, during the first trial, and the present defendants were substituted as defendants in his place. It was brought for an accounting between the plaintiff and Cornelius K. Garrison, the defendants' testator, with respect to their transactions in the construction of the Wheeling and Lake Erie railroad in the state of Ohio, and in the sale and hypothecation of the securities issued by the company. The action has been tried three times; the first trial took place before Mr. Odell, as referee, who rendered judgment against the plaintiff for $2,191,131.54. This judgment was reversed in the General Term and a new trial ordered. (26 J. & S. 385.) The second trial took place before William B. Hornblower, as referee, who found in favor of the plaintiff and ordered judgment against the defendants for $188,089.73. Both parties appealed from this judgment, but it was affirmed in the General Term without modification. (29 J. & S. 124.) The defendants then appealed to this court, where the judgment was reversed and a new trial ordered. (136 N. Y. 152.) The third trial took place before Austin Abbott, referee, and upon

his report judgment was entered in favor of the plaintiff for $670,116.30, together with costs and disbursements. From this judgment an appeal was taken to the Appellate Division by the defendants, in which court the judgment was reversed both upon the facts and the law, and the complaint dismissed upon the merits, with costs. (21 App. Div. 442.) From the judgment entered upon that decision an appeal has been taken to this court.

On the 24th day of September, 1879, the plaintiff entered into a contract with the Wheeling and Lake Erie Railroad Company for the construction and equipment of its projected railroad from Martins Ferry, opposite Wheeling on the Ohio river, to Huron and Toledo on Lake Erie, a distance of two hundred and thirty-three and two-thirds miles. The road was divided into three divisions, the first was to extend from Martins Ferry to Bowerstown; the second division from Bowerstown to Huron, and the third division from Norwalk to Toledo. In consideration of the agreement of the plaintiff to construct and equip the road according to the requirements of the contract, the company undertook to issue first mortgage bonds to the amount of $3,500,000, and paid up stock to the same amount, and to deliver to the plaintiff $15,000 of the bonds and $15,000 of the stock for each mile of the main track constructed by him, such bonds and stock to be delivered to him upon construction of five-mile sections. The company reserved $84,000 of the bonds, which were to be disposed of by the trustees of the company in payment for the construction of fourteen miles of road between Huron and Norwalk, and it also reserved $7,500 per mile of its stock to pay for right of way, grading, bridging and tying the railroad, and other necessary expenses incident to the enterprise. The company further agreed to furnish the contractor available subscriptions, or the proceeds thereof, and aid to the amount of $4,000 per mile of main track, branches and sidings, or so much as may be necessary to furnish right of way, grade, bridge and tie the railroad between Huron and Martins Ferry, and also to use its best endeavors to secure for the contractor available subscrip-

tions and aid to the same extent per mile for the same purposes upon the third division of the contemplated road. The contract was subsequently modified in several particulars, some of which we will allude to hereafter. After the execution of the contract the company delivered to the Farmers' Loan and Trust Company $3,500,000 of its shares of stock, and 3,500 of its first mortgage bonds of $1,000 each to secure the payments provided for by the contract. In November, 1880, the plaintiff borrowed of Garrison the sum of $15,000, and on December 17, 1880, he borrowed the further sum of $25,000, for which he gave his note, payable on demand, for $40,000, the amount of the two loans, and executed and delivered to Garrison the following paper :

"NEW YORK, *December* 17, 1880.

"In consideration of a loan of $40,000 this day made to me by C. K. Garrison, I, C. Robinson Griggs, do hereby transfer to said Garrison all the first mortgage bonds of the Wheeling and Lake Erie Railroad now in the Farmers' Loan and Trust Company, amounting to $3,307,000, making with $193,000 held by W. W. Phelps and others an entire issue of $3,500,000. I further assign to said Garrison my construction contract with said company and all stock to which I now am and may hereafter be entitled under said contract. I further authorize the sale of all or any of said bonds at 85 per cent net and for every $15,000 of bonds sold by said Garrison for myself or any other person, I agree to transfer to said Garrison and authorize him to retain from any stock to be received under said construction contract $7,000 of fully paid stock of said railroad company. All sums received from sales of bonds over the amount of loan and interest, to be paid to me on my order.      (Signed)          C. ROBINSON GRIGGS."

The bonds mentioned in this instrument were soon afterward turned over to Garrison, and thereupon he continued to make advances to the plaintiff to aid in the construction of the road, which eventually amounted to the sum of $4,414,156.10. A portion of this indebtedness was liquidated

by Garrison exercising the option contained in the agreement
of December 17th by crediting to the plaintiff bonds received
by him at 85 cents on the dollar. As to the balance, the
referee has charged Garrison as of May first, 1883, with
$2,062,643.13, the amount of the promissory notes issued by
the railroad company to the plaintiff and by him turned over
to Garrison as collateral security for the advances made by
him, and also by charging Garrison, under date of April 16th,
1887, with the further sum of $348,394.87 on account of the
stock of the company belonging to the plaintiff, which was
held as collateral by Garrison, and which his executors refused
to turn over to the plaintiff.

The controversy in this court arises over the charging of
the defendants with these amounts. The Appellate Division
has held that neither of them should have been charged, and
that they should be expunged from the account, thus leaving,
as is said in the opinion, an apparent balance in favor of the
defendants on account of over two millions of dollars.

The first question arising for our consideration is whether
we have jurisdiction to review the order of the Appellate
Division reversing the judgment entered upon the report of
the referee. As we have seen, it is stated in the order that
the reversal was upon the facts as well as upon the law. In
the case of *Hirshfeld* v. *Fitzgerald* (157 N. Y. 166) we
have recently held that such a certificate does not preclude us
from looking into the case for the purpose of determining
whether there are controverted facts or inferences to be drawn
from conceded facts upon which a reversal upon the facts
could be based, following the case of *Otten* v. *Man. R. Co.*
(150 N. Y. 395, 401). In the *Hirshfeld* case we found that
there was no conflict with reference to the facts, and conse-
quently a reversal upon the facts was unauthorized. The
Constitution has now limited our power to review cases to
questions of law except where the judgment is of death.
Formerly where the reversal was upon the facts, and it so
appeared in the order of reversal, we had the power to review
the facts under sec. 1338 of the Code. But after the adop-

tion of our present Constitution this section was amended by striking out the clause authorizing us to review the facts, and we are thus left with the power only to review the law. Where the facts are controverted, and they must be determined from conflicting testimony or inferences drawn from the surrounding facts, the question becomes one of fact and not of law, and this court has no power to review. But where the facts are conceded or are not controverted, a question of law arises as to the judgment that should be given thereunder. In this case it is contended by both parties that the facts are uncontroverted. The respondents' counsel, in his brief, says: "The respondents contend that the decision of the Appellate Division, so far as it relates to the vital and controlling propositions in this case, namely, that relating to the notes of the railroad company and that relating to the railroad company's stock, was founded upon and warranted by the conceded or uncontroverted facts before the referee; that the only difference between the Appellate Division and the referee upon these two items was, that the Appellate Division drew a legal conclusion from these conceded or uncontroverted facts directly the reverse of that drawn by the referee." We have, accordingly, looked into the record for the purpose of ascertaining for ourselves whether the facts were controverted, and whether the certificate of the Appellate Division should be disregarded, and after a careful examination of the testimony have reached the conclusion that the facts, so far as these claims are concerned, are uncontroverted, and that upon the facts a conclusion of law arises as to the judgment that should be entered thereon.

The history of the claim growing out of the notes is, in brief, as follows: Early in the construction of the road the company failed to perform its part of the agreement with reference to the procuring of its rights of way and to the furnishing the requisite means to pay for the grading, tying, bridging or to furnishing the four thousand dollars subscription, which it had undertaken to do. The matter was brought to the attention of Garrison, and a consultation was had in which

the plaintiff was authorized to, and did, proceed, with the consent of the company, to procure the right of way and to grade and complete the road, Garrison furnishing the moneys, which amounted to the sum of $1,949,710.72, for which amount the company issued its promissory notes, amounting on May 1st, 1883, with interest, to $2,062,643.13. These notes were indorsed over to Garrrison as collateral to secure the advances so made by him. On the 19th day of April, 1883, there was a meeting of the board of directors at which both the plaintiff and Garrison were present. At this meeting the plaintiff presented a letter addressed to the president and directors, in which he proposed to turn over to the company the road so far as completed, and asked for a settlement, stating the amount of his claim. In connection with this letter he presented a certificate of the chief engineer of the company, in which the latter certified that he had examined most thoroughly the portion of the road constructed by the contractor, and that he found it to be constructed in accordance with the detailed provisions of the contract. Thereupon it was unanimously resolved, that " The president of the company is hereby authorized to settle with C. Robinson Griggs, contractor, in accordance with the terms of the proposition for settlement by him presented." A written communication was then presented from Garrison, in which he addressed the president and directors, saying : " Gentlemen : As the contractor intends to turn over the road to the company on the first of May, 1883, 1 have to ask you to settle with me for the cash advances which I have made for your company, viz. (here are inserted certain items not involved in this controversy, following which appears) : For notes of the company, $1,949,710.72 ; interest, $112,932.41." An informal discussion then took place among the directors with reference to Garrison's claim, and he then made a verbal proposal to take the second mortgage bonds of the company as executed and held by him in trust, at the rate of seventy-five cents on the dollar, in partial liquidation of his claim, as set forth and presented at the meeting. After which Mr. Wickham, one of

the directors, moved that the president of the company "be authorized to sell and deliver to C. K. Garrison second mortgage bonds to the amount of $2,280,000, at the rate of seventy-five cents on the dollar, and interest accrued from March 1, 1883, the same to be delivered to C. K. Garrison in part payment of his claim against this company, amounting to $2,449,912.68, as this day specified in his communication to this company." This resolution was carried without dissent, and thereupon a settlement was effected with him in accordance with the terms of the resolution on the first day of May, 1883. Garrison took the bonds and credited the company with the amount thereof at seventy-five cents on the dollar, making $1,736,600, and at the same time turned over to the company that amount of the promissory notes. Some time thereafter he surrendered to the company the remaining notes amounting to $326,043.13, and had them canceled, charging that amount up against the company in his open account.

It is claimed on behalf of the defendants that the notes were transferred by the plaintiff to Garrison as collateral for the advances made by him, and that the bonds were delivered to Garrison to take the place of the notes; that he subsequently held the bonds during his lifetime, and that his executors still hold them as collateral security for the advances made to the plaintiff; that as to the remaining notes, amounting to $326,043.13, which he surrendered to the company and had canceled, he was liable as for a conversion, and inasmuch as there was no evidence showing the value of the notes at that time, there could be no recovery, and, consequently, the plaintiff was entitled to no credit therefor in the accounting.

On behalf of the plaintiff it is claimed that Garrison treated the notes as his own; that he purchased the second mortgage bonds at seventy-five cents on the dollar, paying therefor with the notes; that the balance he surrendered to the company, charging it for the amount, accepting its indebtedness as his own, and that, consequently, the plaintiff is entitled to a credit for the full amount of the notes.

If the claim of the defendants is to be sustained, then, as

the Appellate Division has stated, the plaintiff is still indebted to the defendants in an amount exceeding two millions of dollars, and at the same time he has been deprived of his promissory notes and of any opportunity of collecting them of the company or of its stockholders. It is said that the company was insolvent at that time. Possibly it was, in the light of what has since been disclosed. But it is evident that it was not so regarded at the time by the defendants' testator. A new railroad had just been completed and turned over to the company by the contractor; its value depended upon its future earnings, which at that time were uncertain, and could only be determined by actual test thereafter. But even assuming the company to have been then insolvent, under the Constitution and statute of the state of Ohio the stockholders were liable for the debts of the corporation to an amount equal to their stock, and Garrison at that time was the owner of a majority of the stock. So that, we think, it cannot be held that the notes at that time were of no value.

The plaintiff, at the time of making the contract to construct the road, was possessed of but little means, he having, as he confesses recently, been discharged in bankruptcy. The company had failed to perform its part of the contract in procuring the right of way and the means it had undertaken to supply, and the plaintiff was left without the power to proceed with his contract. In the meantime Garrison had become interested in the road, and had assumed, in a large degree, its supervision and management. He had given directions for a superior construction to that required by the contract; the embankments and cuts were to be wider, the bridges were to be constructed of iron instead of wood, and the rails were to be of steel instead of iron. He had already supplied a large sum of money and had taken the bonds and stock of the company and an assignment of the plaintiff's contract. There was no way in which he could be reimbursed for his expenditures except through the bonds and stock of the company, which would be of no value unless the road was completed. Under these circumstances he concluded to advance the

money. In form he advanced it to the plaintiff and charged him therefor, but in effect and in equity it was an advancement to the company to enable it to meet its obligations with the plaintiff, and it is evident that Garrison so regarded it. As early as 1881 we find Garrison in consultation with his attorney, Mr. Swayne, discussing the matter in the presence of Griggs as to how these advances should be settled with the company. It appears that second mortgage bonds had been suggested. Garrison apparently approved of this scheme for finally settling the account, but he did not want to wait for the bonds, and Swayne tells us that he suggested promissory notes. It appears that at that time the advances amounted to $1,234,177.33, and thereafter the advances continued for that purpose until they reached the amount of $1,949,710.72. Garrison wanted the notes for the purpose of having a stated account, until the mortgage could be issued. It was going to take time to engrave the bonds and get the mortgage, and the taking of the notes was a mere temporary expedient. Shortly afterwards a meeting of the directors was held, and a committee was appointed to pass upon the accounts, and the notes were given, the first batch being for the amount of the advances that had then been made, and the last batch for the amount of the advances thereafter made. The directors also passed a resolution authorizing a second mortgage and bonds to the amount of $2,800,000 to be issued. This was done and the bonds were turned over to Garrison to be held by him in trust for the company. They were so held by him until the meeting of the 19th of April, 1883, together with the notes that had been issued for these advances. At this meeting, as we have seen, he asked the president and directors in writing to settle with him "for cash advances which I have made to your company." He then states the items of his cash advances, among which is the $1,949,710.72, the amount of the promissory notes in question. By this letter he not only treats the advances as made by him to the company, but he treats the notes as his, demanding payment. Then follows the discussion between himself and the directors,

in which he offers to take the second mortgage bonds at seventy-five cents on the dollar, and thereupon the resolution was passed, in which the president was authorized *to sell*, not substitute, the bonds to Garrison at the rate of seventy-five cents on the dollar. This resolution is in writing, appearing upon the minutes of the meeting of the directors, and to our minds, when considered in connection with the settlement finally effected on the 1st of May, 1883, is capable of but one interpretation, and that is, Garrison purchased the bonds of the company for seventy-five cents on the dollar, paying therefor with the notes of the company, which it had issued to the plaintiff, as we have already shown, but which were intended to cover the advances that Garrison had made on behalf of the company. The bonds so purchased were not the plaintiff's, and Garrison never claimed or pretended that they were, or that he held them as collateral. On the contrary, he repeatedly, in conversation with others, declared that he had purchased the bonds, and subsequently, when he made an assignment, reported the bonds as his in his schedule of assets. Shortly afterwards he delivered over to the company the remaining notes in his hands, and charged the company with the amount in his open account, again treating the notes as his and dealing with them as his own. His executors insisted that in doing this he became guilty of a conversion. We do not so view the transaction. In the first place, it is not the usual practice in a court of equity to allow a party to avail himself of his own wrongful acts for the purpose of evading liability. Suppose Garrison had brought an action against Griggs to recover the amount of these advances, could he recover without accounting for the notes? Suppose, further, that Griggs should come into court with a tender of the amount of the claim upon the return to him of the notes which Garrison held as collateral, could Garrison be excused from returning the notes upon the plea that he had converted them, and that he had received nothing therefor? We think not. In the second place, the notes were, as we have shown, equitably Garrison's. Whilst in form he had advanced the money to the plaintiff

and had charged him on his books, and the notes had been issued to the plaintiff and by him indorsed over to Garrison as collateral security, still the money was advanced to meet the obligations of the company, and the notes were issued in payment of those obligations. They thus equitably and in effect became Garrison's notes, and he proceeded to deal with them as such. This appears from his letters and subsequent conduct, to which we have already referred. His transaction with reference to the notes was approved of by the plaintiff. Immediately after the meeting of April 19th, in a conversation with one of the directors, the plaintiff approved of the sale of the bonds to Garrison to be paid for with the notes, saying that it was a good thing, and upon the trial of this action he testified that he now ratified Garrison's action with reference thereto. True, he did not approve of, or ratify, the failure to give him credit for the notes, or the credit that was given for less than their face value.

There is still another reason for which we think no conversion was intended. After Garrison had disposed of the notes he credited the plaintiff upon his books with the sum of $1,546,982.35. This was seventy-five per cent of the face value of the notes. Subsequently there was credited upon the same account the sum of $515,660.78, which was the remaining twenty-five per cent of the notes. This last item has drawn over it a line in red ink. Had this last credit been allowed to remain upon the books, no controversy would have arisen with reference to these notes. It would then appear that Garrison had collected or disposed of the notes according to his own inclination and had given the plaintiff credit for their amount. The fact that credit was given indicates that at that time no conversion had in fact been made or intended. Whatever induced the subsequent cancellation of this credit, it is not necessary to now consider.

It is not apparent that Garrison's action in surrendering up the notes and causing them to be canceled, charging the company with the amount in his open account, substantially altered his situation. Had the notes been returned to the plaintiff,

Garrison, as stockholder, might have been called upon to pay them, thus reaching the same result in the end as that accomplished by the surrender of the notes, the charging of the company therefor, and the crediting of the plaintiff with the amount.

This view renders it unnecessary to consider, at this time, the question as to whether negotiable paper is presumed to be of its face value, and whether the burden of showing that it was not rested upon the defendants.

We are aware that the conclusion which we have reached differs from that adopted by this court on the former review of this case. (136 N. Y. 152.) At that time the transaction was treated as a conversion of the notes on the part of Garrison, and it was held that the plaintiff could not recover without showing the value of the notes. It is claimed on behalf of the respondents that the evidence is the same now as it was then. We do not propose to enter upon a comparison of the two records, further than to state that a new volume containing upwards of seven hundred pages now appears as a part of the record for the first time. Our conclusions are based upon the new record which contains the finding of the referee that there was no conversion. We, perhaps, should consider ourselves concluded by the former decision of this court in so far as it has expressly determined a question of law, but we do not regard ourselves as bound to adopt its view of the facts as then disclosed. If we are, a new trial was hardly necessary. We consequently are now at liberty to determine upon our own consciences the judgment that should be awarded upon the now undisputed and conceded facts.

Our view of the transaction, so far as the second mortgage bonds are concerned, is that it is the same in effect as if Garrison had purchased the bonds and paid cash therefor, and had then gone to the treasurer of the company and collected the notes; that Garrison elected to treat the notes as his own and accept the obligations of the company, in place of any liability that may have existed on the part of the plaintiff, and that his action in this particular was with the consent and approval

of the plaintiff. Accordingly, when Garrison purchased the bonds of the company and paid therefor with the notes, and when he surrendered the remaining notes to the company and caused them to be canceled, charging it with the amount, he did only what he had the right to do. By the latter act he relieved himself from liability as a stockholder upon the notes, but the legal effect of the transaction was to accept the company's liability to pay his claim and to relieve the plaintiff of any further liability to him growing out of the advances for which the notes were given.

We, therefore, conclude that the credit given by the referee should be approved.

With reference to the credit for stock the history of the transaction is equally complicated. During the course of the transaction between the plaintiff and Garrison, the former acquired under the provisions of the contract and otherwise, a large amount of the company's stock, which he transferred to Garrison. Of this stock Garrison held 24,342 shares, of the par value of $50 each, as collateral security. After the transaction of May 1st, 1883, this stock remained in the possession of Garrison until he made an assignment, and after his death was transferred by the assignee to his executors, who ever since have continued to hold it. Subsequently the trustee under the first mortgage instituted an action for its foreclosure, which proceeded to final judgment and a sale of the property to the executors, which took place on the 23rd of April, 1886. Pending the foreclosure of the mortgage, the defendants devised a plan for a reorganization, and they individually acted as a committee upon the reorganization. The plan adopted by them was, in substance, an offer to every holder of the first mortgage bonds who shall deliver his bonds to the committee on or before the 15th of April, 1886, together with the coupons on each bond maturing or payable after May first, 1884, to deliver three of the bonds of the new company for every four of the bonds of the old company, and also to deliver to such holder ten shares of the stock of the new company for each of the present bonds so delivered,

in the event, and only in the event, that he shall pay to the committee in cash on or before April 15th, 1886, $3 per share on each share of the stock of the new company ; and that any person holding the stock of the old company, who shall transfer and deliver it to the committee on or before April 23rd, 1886, shall be at liberty to purchase the stock of the new company to an amount equal to the par value of his stock in the old company, in the event, and only, in the event, that he shall pay therefor to the committee on or before the 23rd of April, 1886, $35 per share. A reorganization was effected on this basis, and the bonds and stock held by Garrison in his lifetime were surrendered up and the defendants obtained therefor the bonds and stock of the new company. They continued to hold the stock so received until June, 1887, at which time they sold out to a syndicate for $45 per share.

The theory of the plaintiff, which has been adopted by the referee, is to the effect that, by the credit to the plaintiff of May first, 1883, of the amount of the promissory notes held by Garrison, the indebtedness of the plaintiff to Garrison was paid, and that he no longer had the right to hold the plaintiff's stock as collateral security ; that the stock issued by the new company was of the par value of $100 per share, while that of the old company was of but $50 ; that he had the right under the reorganization plan to surrender his old stock and receive the stock in the new company, 12,171 shares, upon payment of $35 per share; that he was prevented from doing this by reason of the refusal of the defendants to deliver to him his stock in the old company, and that in consequence he lost the difference between $35 per share and $63⅝ per share, the amount that the new stock sold for on the Stock Exchange on the 16th of April, 1887, making $348,394.87.

On behalf of the defendants it is claimed that the plaintiff was not entitled to a credit of the amount of the promissory notes held by Garrison on May first, 1883 ; that there was a balance still owing to Garrison ; that he and his executors had the right, and still have the right, to hold the stock as collat-

eral security, and that consequently there was no conversion upon their part; that had the stock in the old company been surrendered to him, there is nothing in the case showing that he would have come into the reorganization and taken the new stock by paying $35 per share, or that he was financially able to do so, and that it could not be presumed that he would have done so.

The right of the plaintiff to a credit on account of the stock depends upon his right to a credit for the notes. If he was not entitled to a credit for the notes, then he remained largely indebted to the defendants, and they had the right to retain his stock as collateral security. But the credit which we have approved relieved him of all indebtedness to Garrison's estate, and the executors no longer had the right to retain his stock and prevent him from making such use of it as he saw fit. He had the right, if he so determined, to enter the new reorganized company and to make use of his stock for that purpose, and we think we ought not to assume that he would not have done so, but rather that the executors, after converting and retaining his stock, and thus preventing him from entering the reorganization, ought to be estopped from claiming that he would not have availed himself of the privilege had the stock been returned to him.

Some complaint has been made by the plaintiff with reference to the discrimination made against him in the plan of reorganization. It will be observed that under that plan those holding bonds were permitted to surrender them and to receive three bonds in the new company for every four surrendered of the old company, and in addition to receive ten shares of the new stock with every new bond upon the payment of $3 per share, and that those having stock could, upon surrendering it, have new stock on paying $35 per share. The plaintiff held no bonds. It thus appears that he would be required to pay $32 more per share than those holding bonds. But it must be remembered that the bonds were the superior lien upon the company's property and were entitled to be paid before any stockholder could share in its assets, and that,

under the plan of reorganization, three bonds in the new company were to be delivered for four in the old company. Thus $25 on the hundred were lost to the old bondholders besides the coupons that had matured upon the old bonds up to the date of reorganization, the stock and the three dollars per share making up the difference. The discrimination, therefore, which existed in the plan is in requiring the stockholders having no bonds to pay in cash thirty-five dollars for their stock. If the assets of the company were insufficient to pay the old bonds and coupons, the defendants would reap a benefit from the cash payments required to be made by the stockholders. Such cash payments would not only give their new bonds a higher standard of value, but would also materially increase the value of their stock in the new company. But it is not apparent that any legal liability arises out of this plan of reorganization. The executors had the right to adopt such a plan as they saw fit. Inasmuch as they were allowed to purchase the property on the sale after the plan of reorganization had been adopted and made public, no complaint with reference thereto can now be entertained as the basis of any right to recover damages. We think, therefore, the plaintiff's right to recover damages is limited to those which he actually sustained in being deprived of his stock. What were those damages? The referee has found that they were the difference between thirty-five dollars per share, which he would have been compelled to pay, and the sixty-three and five-eighths dollars per share, the amount for which the stock sold on the 16th day of April, 1887, being twenty-eight and five-eighths dollars, and amounting to the sum of $348,394.87. In this, we think, he erred. He evidently overlooked the fact that had the plaintiff paid the thirty-five dollars per share on the 23rd day of April, 1886, he, of necessity, would have lost his interest on that sum from that time up to the 16th of April, 1887, being a year lacking seven days, and amounting to upwards of $25,000. In determining the damages sustained this item of interest should have been deducted. We are, however, not satisfied with the amount of

damages found by the referee, even should the interest be deducted. We are aware that at one time it was thought to be the rule that where a stockbroker had converted the stock of his customer he should be held to account in damages at the highest market value which the stock had attained before the trial, and that there were some decisions in this court tending to support that rule. But in the case of *Wright* v. *Bank of the Metropolis* (110 N. Y. 237) it was held that where a pledgee of corporate stock, acting in good faith and under an honest mistake, converts it, it is the duty of the owner to replace it himself within a reasonable time after notice, and the proper measure of damages for the conversion is the highest market price during such reasonable time, and that where the facts are undisputed, what is a reasonable time is a question of law for the court. The theory upon which this rule is based is that justice and fair dealing imposed upon the party the duty of making his loss as light as possible. In this case the plaintiff knew that the defendants had refused to surrender up his stock; he knew of the foreclosure and reorganization, and yet for four years he took no steps to buy in or replace the stocks of which, by the conversion, he had been deprived. We think there is nothing in the case indicating bad faith on the part of the defendants, and that four years, or even one year, was more than a reasonable time, and that the plaintiff ought not to have waited that length of time in order to select the highest point at which the stock had been sold on the Stock Exchange, and make it the basis of his claim for damages. The evidence upon the question of the value of the stock is very meagre. A stockbroker was called as a witness and testified that on the 16th day of April, 1887, the stock sold for sixty-three and five-eighths. He then tells us that that was the highest price for which it had ever been sold, and that afterwards it had sold down to thirty-five and one-half, which was its lowest price, and that at the time he was giving his testimony it was selling it at about forty-five. The further fact appears, as we have shown, that the defendants sold out their stock in June, 1887, at forty-five.

It will be observed that there is no evidence as to the value of the old stock or of the new stock during the year 1886, or in 1887 until April 16th. We are thus left without any evidence upon which the value of the stock can properly be determined within a reasonable time after its conversion. The rule in such cases is that nominal damages only can be awarded. Ought a new trial to be now granted? This case has been pending for fifteen years. It has, as we have seen, been tried three times with widely varying results. Garrison and his son have died, as have several of the witnesses who were sworn upon the first trial. If the stock had a value during the period to which we have alluded, the plaintiff ought to have shown it. The fact that he did not leads us to infer that it was of but little or no value. Under the circumstances, therefore, we think that this litigation should be now terminated. The balance due the plaintiff February 17th, 1886, as found by the referee, was.................... .... $83,296 21
Interest thereon to date of report, February 26th,
   1896 .................................... 50,102 67

   Balance .................... ............ $133,398 88

The judgment of the Appellate Division should be reversed and that entered up upon the report of the referee modified by reducing the recovery to $133,398.88, and, as so modified, affirmed, without costs of this appeal to either party.

All concur, except BARTLETT and MARTIN, JJ., not voting.
Judgment reversed, etc.