JOSEPH L. CAHALL, Receiver of Lewes Fisheries Company,

*vs.*

DAVID W. BURBAGE.

*Kent, June 1, 1923.*

A person aggrieved by a breach of trust is entitled to be restored to the *status quo ante* as nearly as the facts and circumstances will permit, and if the circumstances are such as to afford him either of two methods of restoration, he may elect as to which of the two he will pursue.

Where a director procured the wrongful issuance to himself of certain shares of stock, the receiver of a corporation was entitled to recover, as the measure of loss on the part of the corporation, the highest intermediate value of the stock from the time of its conversion up to a reasonable time after knowledge thereof was acquired.

Where the director procured the wrongful issuance to himself of certain shares of stock, which he sold to an innocent purchaser, the receiver is entitled to recover from him, not only the dividends which had been personally paid to defendant, but also the dividends which had been paid and would be paid to the innocent purchaser, with interest.

STATEMENT OF THE CASE. This is a bill by Joseph L. Cahall, Receiver of Lewes Fisheries Company, against David W. Burbage to recover money alleged to be due said company by reason of the wrongful issuance to the defendant of fifteen shares of its capital stock.

The Lewes Fisheries Company was organized in January, 1911. Its directors were seven in number. The defendant was one of them. He served as such director and also as vice-president from the time of its organization until some time during the year 1912, after the month of January.

On September 18, 1911, the defendant and the remaining six directors issued to each of themselves fifteen shares of the capital stock of the company, the same being issued as full paid and non-assessable stock. The fifteen shares so issued to the defendant give rise to the controversy involved in the pending suit.

For the facts attending the issuance of· said shares by the directors to each of themselves, reference may be had to the opinion of the Chancellor in *Cahall v. Lofland, et al.*, 12 *Del. Ch.* 299, 114 *Atl.* 224, and to the opinion of the Supreme Court in the same case on appeal, 13 *Del. Ch.* 384, 118 *Atl.* 1. In that case, the bill was against the six co-directors of Burbage and complained not only against the act of the directors in issuing fifteen shares of stock to each of themselves, in the doing of which Burbage participated, but also against certain other transactions done by the six in which Burbage had no share or part.

The complainant omitted Burbage as a party defendant in the other suit and filed the pending bill praying relief against him separately from his codirectors.

The pending cause was, at a prior stage, before the Chancellor on demurrer. See 13 *Del. Ch.* 299, 119 *Atl.* 574.

*Henry Ridgely* and *George M. Fisher, Jr.*, for the complainant.

*James M. Tunnell*, for the defendant.

THE CHANCELLOR. In *Lofland v. Cahall*, 13 *Del. Ch.* 384, 118 *Atl.* 1, the Supreme Court of this State, after reviewing the facts attending the issuance of fifteen shares of the capital stock of Lewes Fisheries Company by the directors to each of themselves, said:

"Our conclusion is, that the appellants, acting as directors, issued to themselves the ninety shares of stock on September 19, 1911, not only without paying for the same as required by the Constitution, but without any consideration at all. They parted with nothing of value, paid nothing for the stock and had no thought of paying for it. Their act was a pure gift from themselves as directors to themselves as individuals without the consent or knowledge of the other stockholders, and constructively fraudulent. Such being the case, the transaction was voidable at the election of the company."

The fifteen shares of stock issued to the defendant, Burbage, are in the same situation as were the ninety shares issued to the other six directors in the other suit. They therefore must, in the light of the Supreme Court's finding, be held to have been fradulently issued and to be voidable at the election of the company.

The only question open for discussion in the pending cause is as to the extent of the decree to be entered. In the suit against the other six directors, it so happened that the fifteen shares issued to each of them continued to be held by each of them down to the date

of the decree. The decree in that case directed that all dividends paid out on the shares should be returned to the company and that each of the fifteen shares, ninety in all, should be canceled. This was in harmony with the theory that the company, through its receiver, had chosen to elect to avoid the issuance of the stock.

In the instant case the facts are different. Here, Burbage does not now have the fifteen shares issued to him. After receiving a twenty per cent. dividend ($300) on January 1, 1912, he sold his stock to an innocent purchaser for value, receiving therefor either $120 or $130 a share. Thereafter, further current dividends were declared on the said fifteen shares, and duly paid, as follows: December 24, 1912, ten per cent. ($150); January 15, 1914, ten per cent. ($150); January 5, 1915, ten per cent. ($150); December 20, 1916, ten per cent. ($150); and December 18, 1917, and June 10, 1918, distribution dividends respectively of one hundred and fifty per cent. ($2,250) and fifteen per cent. ($225) were paid in the course of winding up the company's affairs. It thus appears that while Burbage held the stock he personally received $300 in dividends; and that his transferee received a total in dividends of $3,075. It also appears that there will be a further distribution dividend which the purchaser of the defendant's stock will, as an innocent holder for value, be entitled to receive.

When the six directors in the other suit paid back to the company all dividends and surrendered the shares unlawfully issued, it is apparent that they were but returning to the company all that they had personally received. In that case money damage to the company arising from the fraudulent issue exactly equaled the personal profit reaped by the defendants. In the instant case, however, the fact that Burbage sold his stock to a bona fide purchaser after personally receiving only one dividend of $300 brings about the result that the damage done to the company exceeds the persnal profit obtained by the wrongdoer, because in addition to the dividend of $300 so received by the defendant, the company has been required to pay to the present holder of the fifteen shares of stock the further dividends above mentioned and will be required to pay to such holder the final distribution dividend yet to be declared.

The defendant contends that he should be held accountable

only for the profit actually received by him personally, and that he should not be directed to make good the total loss which his wrongdoing has occasioned the company. On the other hand, the complainant contends that the measure of the sum due upon a breach of trust is not what the violator of the confidence has himself profited, but rather what he has caused his *cestui que trust* to lose, and that this is the rule that should prevail in such circumstances as are found here.

That the liability of the defendant is to be determined according to the principles that obtain in dealings by a trustee with property of his trust, is plainly settled by the decision of the Suppreme Court of this State in *Lofland v. Cahall, supra.* If this were an ordinary case of breach of trust, what would be the measure of the sum which the wrongdoer should be decreed to pay? Textbooks and adjudicated cases unite in giving the same answer to this question.

In *Hill on Trustees,* (2d *Amer. Ed.*) at star *page* 521, the following is found:

"The relief afforded in equity, in case of a breach of trust, is twofold: First, it is retrospective, in order to remedy the mischief already done; and, secondly, prospective, with a view to the prevention of further injury. ＊ ＊ ＊ And in taking the account against the trustee, he will invariably be charged with the amount of principal and income, which would or might have been received from the trust estate, if no breach of trust had been committed."

Professor Pomeroy in his work on *Equity Jurisprudence,* (*4th Ed.*) at *Section* 1080 of *Volume* 3, lays down the following rule:

"It has already been shown that a beneficiary may always claim and reach the trust property through all its changes of form while in the hand of the trustee, and that he may also follow it into the possession and apparent ownership of third persons, until it has been transferred to a *bona fide* purchaser for valuable consideration and without notice; and that a court of equity will furnish him with all the incidental remedies necessary to enforce his claim and to render it effective. In addition to this claim of the beneficiary upon the trust estate as long as it exists, the trustee incurs a personal liability for a breach of trust by way of compensation or indemnification, which the beneficiary may enforce at his election, and which becomes his only remedy whenever the trust property has been lost or put beyond his reach by the trustee's wrongful act. The trustee's personal liability to make compensation for the loss occasioned by a breach of trust is a simple contract equitable debt. It

may be enforced by a suit in equity against the trustee himself, or against his estate after his death, and the statute of limitations will not be admitted as a defense unless the statutory language is express and mandatory upon the court. The amount of the liability is always sufficient for the complete indemnification and compensation of the beneficiary."

In *Perry on Trusts*, (*6th Ed.*) *Vol.* 2, § 847, *p.* 1386, it is said:

"In awarding compensation to the *cestui que trust* for a breach of trust by the trustee, the court does not regard it as material that the trustee has made no profit or advantage out of the estate. If there is a breach of trust, and an inevitable calamity destroys the property, the trustee must account for it."

In the very lengthy case of *Hart v. Ten Eyck*, reported in 2 *Johns. Ch.* (*N. Y.*) 62, Chancellor Kent used the following language:

"The last point which remains to be considered, is in respect to the rule or measure of damages. The charges which have been made out against the defendants are all torts and breaches of trust. They differ essentially from cases of damage founded on breaches of contract. Here has been a continued series of bad faith, and it is requisite to the character of public justice, and for example's sake, that the injured party should be completely indemnified, and that the other should answer for all the consequential damages resulting from the fraud. This is a fundamental principle in sound jurisdrudence. *Kaines' Eq., vol. 1, p.* 67. The civil law and the French law declared this to be the rule. (1 *Domat. p.* 3, *tit.* 5, § 2, *No.* 8, *pp.* 407, 409, 411, 426), and it is easy to illustrate it by cases in the English courts."

The following rule is announced in *Proprietors of Eastern New Jersey v. Force's Executors*, 72 *N. J. Eq.* 56, 127, 68 *Atl.* 914, 942:

"First. That the measure of the equitable damages which a *cestui que trust* is entitled to recover against his trustee as compensation for a breach of trust is, at the option of the *cestui que trust*, (1) the amount the *cestui que trust* has actually lost by the breach, or (2) the amount, if anything, which the trustee has gained thereby."

Again in *Freeman v. Cook*, 6 *Ired. Eq.* (41 *N. C.*) 373, appears the following:

"In giving relief for a breach of trust, a court of equity endeavors in the first place, as far as possible, to replace the parties in the situation they would have been in, if no breach of trust had taken place. And for this purpose,

when the trust property has been improperly disposed of, and is capable of being followed in specie, it will compel the trustee, or the party in possession, with notice, to reconvey it. If it cannot be followed, or the person in possession cannot be made liable to the trust, the trustee will be decreed to compensate the *cestui que trust*, by payment of the value of the property so lost. And he will be decreed to account for all rents and hires, and interest and other profits, which would or might have been made from the property lost."

From the foregoing excerpts taken from authoritative text-writers and from adjudicated cases it is plain that the person aggrieved by a breach of trust is entitled to be restored to the *status quo ante* as nearly as the facts and circumstances of each case will permit. If the circumstances are such as to afford him either of two methods of restoration, the right exists to elect which of the two he will pursue.

In the instant case, it is impossible for the company to regain the stock which the defendant wrongfully, in breach of his fiduciary character of director, took unto himself. This is so because the stock is in the hands of an innocent purchaser for value. If it had remained in the possession of the defendant, cancellation of it could be decreed. Nor can a purchase of a like number of shares be made so as to effectually restore the company to its former position, because the company is in process of dissolution. And if such purchase could be made, it could only be at such figure as the final distribution dividend will yield to it.

Where the breach of trust consists in the sale of stock belonging to the trust estate, the beneficiary is entitled to require his trustee to make good to him in full the loss which the wrong has entailed. The measure of this loss, so far as the capital is concerned, is the highest intermediate value of the stock from the time of its conversion up to a reasonable time after knowledge is acquired of the unlawful act or conversion. *Galigher v. Jones*, 129 *U. S.* 193, 9 *Sup. Ct.* 335, 32 *L. Ed.* 658; *McKinley v. Williams*, 74 *Fed.* 94, 20 *C. C. A.* 312. This rule is founded upon the equitable principle that the owner should not be required to bear the risk of fluctuations in the market; that if he desires to purchase shares to replace the ones wrongfully taken from him, the risk of the market should be borne by him who drove the injured owner to the necessity of entering it in order to repair the wrong done.

The foregoing principles all find an application to one phase or another of the case before the court. In one sense of the word, shares of stock of a company, though not yet issued, are nevertheless, so far as the directors are concerned, to be considered as somewhat similar to the corpus of trust funds in the hands of a trustee for management. The law imposes upon the directors the duty of disposing of the shares in the interest of the corporation. The manner in which they perform that duty must meet the exacting standards required of a fiduciary acting in an office of trust and confidence. The fifteen shares of stock which the defendant, Burbage, fraudulently converted to his own use are, therefore, to be regarded just as though they constitute a part of the property of a trust fund committed to his charge. Had he been an ordinary trustee holding these shares for a *cestui que trust*, he would, in case he sold them to an innocent purchaser and thereby lost them to the real owner, be liable to the beneficiary for all loss occasioned thereby. This appears clear. Not only would he be liable for the value of the shares, but as well for all dividends diverted from the true owners. I cannot see why, if this be so in case Burbage had been an ordinary trustee as just suggested, the same liability to the company for dividends declared on the stock does not also exist under the facts found to exist here. To the suggestion of the defendant's solicitor, that if this be true, then the highly unreasonable result would follow, viz., that in case the company were a continuing one and paying dividends for a long time in the future, the liability might never end, the answer is that as soon as the company acquired knowledge of the wrong the status of the liability would within a reasonable time thereafter be fixed by the law. It would always be within the power of the defendant to terminate the accumulation of liability by frankly advising the proper officers or the stockholders of the fact of the wrongful conduct.

With respect to the dividends declared and paid, whether to Burbage personally or to the innocent purchaser, I see no escape from the proposition that he must make them all good with interest. In no other way can the company be restored to the situation in which it would have been in, had the shares not been issued. The issuance of the shares drew from the treasury of the company

dividend moneys which otherwise would have remained undisturbed. The circumstance that all these dividends did not go into the pocket of the defendant does not alter the fact that his act in wrongfully issuing them to himself caused the company to lose them. If the company is to be indemnified fully, the dividends must be returned.

This company is in course of dissolution. At least one other dividend will be paid to the stockholder. The same principle which requires the return of dividends heretofore declared, requires that the distribution dividend, or dividends, yet to be declared shall likewise be made good by the defendant. If the stock were still held by Burbage, then final distribution dividends could be saved to the company by requiring that he deliver up his stock for cancellation, as was done in the other suit before referred to. But this is impossible. The company is bound to pay to the bona fide holder of the fifteen shares still outstanding the final distribution dividends. This necessity having been imposed upon it by the wrongful act of the defendant, he must make good to it the amount required for that purpose. A master will be appointed to ascertain this amount.

I have above suggested that unissued shares of stock so far as the directors are concerned are to be considered as somewhat similar to property in the hands of a trustee for management. When shares are issued, they may also be considered in yet another light. While the relation of a stockholder to the corporation is not that of a creditor to a debtor, yet when stock is issued a liability on the part of the company is thereby created. If dividends are declared, the company is liable to all its stockholders to pay them, and suit may be successfully brought to recover them. Furthermore, on liquidation the company is under liability to pay each shareholder his proper portion of the asset values. This being so, it is evident that when the fifteen shares in question were issued, a liability was imposed upon the compay to pay out its funds thereon as proper occasion arose. The act of Burbage in wrongfully and in breach of his duty as a director taking the shares, and, having done so, in selling them to a bona fide purchaser, thus fastened upon the company an obligation from which it could not escape. It was just as though, if he were a typical trustee, he

had wrongfully placed a debt upon the trust estate which it was bound to pay. In such circumstances it would appear to be in accord with the plainest dictates of justice that the wrongdoer should himself recompense the injured party to the extent of the debt which his act had unjustly created. By parallel of reasoning, it would seem that Burbage's wrongful act in placing the fifteen shares of stock beyond the reach of the company and thereby subjecting it to a liability, should exact of him that he make good to the company the amount which his behavior has compelled it to lay out. In *Hutchinson v. Sutton Mfg. Co.*, (*C. C.*) *57 Fed.* 998, it was said that the directors of a manufacturing corporation had no authority to divert the corporate property by issuing accommodation paper, or otherwise loaning its money or credit without consideration; and that if they did so, they would become personally liable to the company for breach of duty to the extent of the payments made, or the liabilities incurred. On the same principle, Burbage should likewise be held liable here.

Whether, therefore, the issuance of the stock be regarded as a disposal of the trust property committeed to the custody of the directors, or as the imposing of a liability upon the company, the result, under well-settled principles, is the same. The defendant is liable for all the damage done, whether the profit was reaped by himself alone or shared by others. The action of the Chancellor in the case of *Cahall v. Lofland, et al., supra*, affirmed by the Supreme Court in *Lofland, et al., v. Cahall, supra*, in holding the six directors, defendants in that suit, jointly as well as severally liable for the total dividends paid out to all of them is consistent with the principle I have accepted in this case, viz., that the proper measure of damage is not the profit which the defendant personally acquired, but the loss he inflicted. If this were not the correct principle to apply, then the decree in the other suit should have required each director to be responsible only for those dividends which he had himself received.

Let a decree be prepared in accordance with the foregoing.