## F. W. WOOLWORTH CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 276.

Circuit Court of Appeals, Second Circuit.

July 2, 1941.

Thomas I. Sheridan and Howard L. Klein, both of New York City, for petitioner.

Robert B. Watts, Laurence A. Knapp, Ernest A. Gross, A. Norman Somers, and Owsley Vose, all of Washington, D. C. and William S. Gordon, Jr., of Boston, Mass., for respondent.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

The F. W. Woolworth Company, a New York corporation having its principal place of business in New York City, has petitioned to have an order of the National Labor Relations Board reviewed and set aside. In answering the petition, the Board requests that its order be enforced. Petitioner has been found by the Board to have engaged in violations of sections 8(1) and 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1) (3), with respect to the employees of a warehouse which it operates in New York City, for

the purpose of storing and distributing merchandise to its retail variety stores.

■ Prior to July, 1937, those employees were unorganized. In that month, when there were about 420 employees, a union (which later became Local 65, United Wholesale and Warehouse Employees of America) began a campaign to organize the warehouse. By some time in November, the union had succeeded in signing up 291 men as members. The Board found that, during this period, petitioner engaged in violations of section 8(1) of the Act by interfering, restraining and coercing the men in exercising the rights of self-organization guaranteed to them by the statute. In making this finding, the Board had before it a number of incidents, none of them perhaps conclusive in itself, which, added together, constitute a body of anti-union activity which amply justified the finding of the Board. Since it is not our province to do more than determine whether there was evidence to sustain the Board's findings [section 10(e), 29 U.S.C. A. § 160(e)], we do not set out the evidence in any detail.

■ The facts adduced at the hearing showed that a principal aim of the union's campaign, announced in circulars distributed outside the warehouse, was the elimination of compulsory overtime work and the payment of overtime at time and one-half. This was an old grievance, yet nothing was done about it until a few days after the distribution of the union's circulars, when the company, suddenly and without explanation, began to ask its employees whether they wished to work overtime, and began to pay time and one-half for such work. The Board concluded that this, and a later wage raise, were tactics designed to forestall the union's campaign. Petitioner objects that there is no proof that this was, in fact, the company's purpose, and it points out that the union promptly claimed the action as its first victory. The latter is, of course, immaterial; and the former goes to an issue of credibility and inference with which the Board is more capable of dealing than are we. During July and August petitioner abandoned its old practice of permitting employees to move about the packing room without restraint, and assigned certain employees to the middle aisle, ordering them not to leave it. The men working there were under greater surveillance by the foremen and were to some degree isolated from the rest of the employees. No explanation was given for the establishment of this "observation aisle", and there was positive evidence that inability to move about the room resulted in reduced efficiency. All of the men assigned to the aisle were union members; among them were the shop chairman, several captains and financial secretaries, and others who later became captains. The Board concluded, and we think properly, that petitioner segregated active union men in order to hinder self-organization. Petitioner attacks the Board's finding because there was no positive proof that it knew which of its employees were, and which were not, members of the union. This same protestation is made as a defense to the allegation of discriminatory discharges (which will be discussed below), where the evidence is capable of no other rational explanation than that petitioner knew which employees were members. It seems unlikely that petitioner remained entirely ignorant of the identity of the active union men at a time when they were distributing circulars, soliciting membership, signing up other employees, and collecting dues from their fellow workers. The Board found that the union duties of the active men involved "extensive contact" with the other employees which petitioner must have noted. We cannot say the Board was wrong.

■ Implicit in petitioner's argument is a basic objection to reliance upon so-called "circumstantial evidence". But courts and other triers of facts, in a multitude of cases, must rely upon such evidence, i. e., inferences from testimony as to attitudes, acts and deeds; where such matters as purpose, plans, designs, motives, intent, or similar matters, are involved, the use of such inferences is often indispensable.[1] Persons engaged in unlawful conduct seldom write letters or make public pronouncements explicitly stating their attitudes or objectives; such facts must usually be discovered by inference; the evidence does not come in packages labelled, "Use me", like the cake, bearing the words "Eat me", which Alice found helpful in Wonderland.

■ The Board, after weighing conflicting evidence, found that petitioner's officials had questioned several employees

---

[1] Cf. Wigmore, Principles of Judicial Proof (1913) 7–8, 30, 734–743.

about their union membership and activity; it concluded that the questions were forbidden by the Act. Petitioner's attack on this finding virtually concedes that we are being asked to re-weigh the evidence and re-determine the credibility of the witnesses. This the Act forbids us to do; see section 10(e). Petitioner urges further that the manager of the warehouse issued instructions to the assistant manager, which he relayed to the foreman, not to interfere with the men's union activity. Such instructions, petitioner, or petitioner's counsel, must know, would hardly save it from responsibility for any other unlawful act by its supervisory employees; we can hardly believe that the company seriously thought that such a pious declaration could immunize it from the acts of its personnel officials, when those acts constituted violations of the National Labor Relations Act. Finally, during a hearing in April, 1938, conducted by the Board to certify a collective bargaining agency, petitioner circulated among its employees a petition requesting the Board to hold a secret election. The union's expressed position was that it could be certified upon the record, without an election, because the evidence showed that it represented a majority of the employees. The company's petition, which was signed within an hour and a half by 284 of the 285 employees in the warehouse, was regarded by the Board as an invasion of a sphere reserved to employees and as an invitation to them to repudiate the union's position. In the circumstances, the Board's finding that this was a violation of section 8(1) of the Act is amply justified.

In sum, petitioner's case does not remotely approach the strength and persuasiveness which we require before we will undertake to reverse the Board's findings. Its entire case on this issue, in effect, is a plea that, if we were to try the case de novo, we might conceivably find evidence to justify a decision contrary to the Board's. That is not our function, and it is a waste of our time and of the client's money to bring before us cases based on such a misconception of our duties.

The Board found further that petitioner had engaged in violations of section 8(3) of the Act by a series of discriminatory discharges. The facts, as found by the Board, are these.[2] For a reason which the Board found it unnecessary to establish, but which we will assume, as petitioner contends, was unfavorable business conditions, petitioner discharged a number of men in five lay-offs in November and December, 1937. Prior to the discharges, petitioner had 415 employees, of whom 290, or 70%, were union men. Of the 152 men laid off, 145, or 95%, were union men. The men eliminated included the union's shop chairman, its entire shop committee, its 12 financial secretaries, and 29 of its 32 captains. Petitioner objects to the computation of these illuminating figures on a plant-wide basis, urging that a departmental comparison is more significant. But an examination of its tables does not suggest a different conclusion. The four largest departments had union memberships before the discharges in the following proportions:

| | |
|---|---|
| Packers | 84% |
| Checkers | 62% |
| Order clerks | 72% |
| Stock clerks | 39% |

Yet the percentages of union members among the men discharged from these departments were:

| | |
|---|---|
| Packers | 100% |
| Checkers | 95% |
| Order clerks | 94% |
| Stock clerks | 86% |

The discharges resulted in a reduction in the percentage of union membership in every department except three; in two of these, there were no discharges, and the third was 100% organized; so that the percentage could only be reduced by a complete elimination of the department. Petitioner's tables, even by omitting the actual numbers involved in each department and by conveniently including the deceptive percentages of the three departments just referred to, falls far short of establishing its assertion that the figures "might normally be expected where selection of men to be discharged from each department is made without knowledge, as was the case here, of which men were union members and officers and which were not".

[2] Certain minor changes in the figures as originally found have been made. The corrected figures are somewhat more favorable to petitioner in the computation of back pay, and the Board has asked that its order be modified to reflect the changes. The request is granted.

As we said above, the Board had before it evidence that petitioner knew the identity of many of the union's members. This, coupled with the tell-tale figures just cited, was ample to justify the inference that anti-union discrimination was shown in the discharges. See N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L. Ed. 368. The petitioner has failed to show that the Board was in error in finding that it had engaged in violations of section 8(3) of the Act.

We turn now to the Board's order. Part 1 is a cease and desist order, forbidding discrimination with regard to employment, and including an "in any other manner" clause of the kind involved in the Express Publishing case, N. L. R. B. v. Express Pub. Co., 61 S.Ct. 693, 85 L.Ed. —. (March 3, 1941). Unlike that case, however, here the record discloses "persistent attempts by varying methods to interfere with the right of self-organization in circumstances from which the Board . . could have found the threat of continuing and varying efforts to attain the same end in the future". The propriety of the "in any other manner" clause in such circumstances was recognized in the Express Publishing case, supra. That part of the Board's order, therefore, is upheld.

The Board ordered reinstatement of the union men who were discharged, 140 in number,[3] but permitted an adjustment to the altered business needs by providing that the available jobs, if insufficient to go around, are to be divided among the men remaining in petitioner's employ after the lay-offs, former employees reinstated after the lay-offs, and union men discharged but never reinstated. Such apportionment is to be according to petitioner's usual methods of reducing its working force and without discrimination. No doubt the ideal remedy would be to require reinstatement only of those employees who were the victims of discriminatory discharge; but petitioner's conduct[4] has made it impossible to identify them. The Board might, perhaps, have adopted a policy of restoring the percentage of union membership to the status quo, by requiring the petitioner to select only an appropriate percentage of employees from the reinstatement list. But the Board concluded that the policy of the Act would best be served by giving to each of the discharged union men an opportunity to be reinstated, since, absent discrimination, each of them *might* have been retained, even though in that way more might be reinstated than would have been retained. In its choice from among the available means, the Board was performing its function, which we will not review, of deciding what would best effectuate the purposes of the Act.

The Board ordered that all who are not thus reinstated should be placed on a preference list, to be offered employment as it becomes available. This, we think, was erroneous; in order to avoid the improper assumption that all new employees would be union men, petitioner should have been required to select men from the preference list only in the old proportion of union men, i. e., seven men out of ten should come from that list. The order is modified accordingly.

The Board has also made a back-pay order. Admittedly, in reducing its staff, petitioner would have discharged some union men even if it had not acted in a discriminatory manner; the ratio of union men in a non-discriminatory lay-off would, the Board assumed, have been 70%,[5] the same as in the plant as a whole. Of the 152 men discharged, then, 106 would have been union men. Since 145 union men were actually discharged, petitioner's unlawful conduct resulted in the lay-off of 39 men, the excess of 145 over 106. The Board ordered that the amount which would have been earned by these 39 men be distributed among the 140 men ordered reinstated, with the usual deduction of other earnings during the period from the amount each is to receive.[6] This part of the back-pay order takes in the period from the discharges of November and December, 1937, until

---

3 145 union men were discharged, but 5 were omitted from the reinstatement order because their names were omitted from, or insufficiently stated in, the complaint or amendments thereto.

4 See our discussion below, of the Board's treatment of this same issue in computing the back-pay award.

5 As indicated above, we are following corrected figures, more favorable to the petitioner, at the Board's request.

6 The Board's request that we eliminate from its order the requirement that petitioner make payments to government work-relief agencies, on the authority of Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6, is granted.

certain reinstatements in January and February, 1938. At the latter date the excess of union men actually laid off over union men reasonably to be expected to be laid off was reduced to 29. The Board ordered that the back-pay of these unidentified employees, from the date of the last reinstatement to the date of the Board's order, be divided among the men remaining laid off.

█ In thus striving to restore the status quo, the Board was forced to use hypothesis and assumption instead of proven fact. But its order is not invalid on that account; for petitioner, by its unlawful conduct, has made it impossible to do more than approximate the conditions which would have prevailed in the absence of discrimination. The Board could not find the actual victims of discrimination, so it has divided the damages among all. Even in private litigation, the courts will not impose an unattainable standard of accuracy. "Certainty in the fact of damage is essential. Certainty as to the amount goes no further than to require a basis for a reasoned conclusion". Palmer v. Connecticut Ry. & Lighting Co., 311 U.S. 544, 61 S.Ct. 379, 385, 85 L.Ed. 336. Even if it were true that, if an individual employee were suing, under a statute making an unfair labor practice a private tort, he would find it difficult to prove personal damage, the analogy would not be pertinent here: The Board is administering a public statute, and we cannot forget that a public wrong is being redressed. That wrong, and even its amount, are established; we have here only an objection because some who could not have been injured are sharing with those who were. That, it seems to us, is no affair of petitioner; we see no reason for heeding his plea that he must go scot-free because, when indulging in improper practices, he chose a method which leaves the victims unidentifiable. There is nothing punitive in the Board's common sense treatment of this problem. Cf. Eagle-Picher Mining & Smelting Co. v. N.L.R.B., 8 Cir., 119 F.2d 903 (May 21, 1941). The lump sum back-pay award (16 N.L.R.B., 727, 835) upheld in that case, has been noted, with seeming approval, by the Supreme Court in Phelps Dodge Corp. v. N. L. R. B., 61 S.Ct. 845, 85 L.Ed. —, 133 A.L.R. 1217, at note 7.

█ Petitioner also urges that there was a denial of due process of law in that the Board, after entering an order on July 21, 1939, setting aside the trial examiner's intermediate report and directing that proposed findings be issued, vacated that order a year later, on July 3, 1940, and then, without first giving to petitioner notice and an opportunity to be heard, directed that the intermediate report be reinstated. But since petitioner had been given a full hearing on the earlier occasion, there was no need to grant a new hearing when reinstating the intermediate report; a court could properly act in similar fashion; we can find no constitutional objection to a decision based on the report, petitioner's exceptions, and the previous oral argument.

The petition to review and to set aside the Board's order is denied. The request for enforcement of the order, as modified in accordance with this opinion, is granted.