### HARDESTY et ux. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 9976.

Circuit Court of Appeals, Fifth Circuit.

April 29, 1942.

Rehearing Denied June 5, 1942.

Harry C. Weeks, of Fort Worth, Tex. for petitioners.

L. W. Post, Sewall Key, J. Louis Monarch, and Lee A. Jackson, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue and Claude R. Marshall, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

The Board of Tax Appeals sustained a determination by the Commissioner that certain intangible drilling and development costs were not deductible from taxpayers' gross income as ordinary and necessary business expenses under Article 23(m)–16 of Treasury Regulations 94, Section 23(a) Revenue Act of 1936, 26 U.S.C.A. Int.Rev. Acts, page 827. The findings and well-reasoned opinion of the Board are reported in full, Hardesty v. Commissioner, 43 B.T. A. 245, and for this reason it is not necessary to give a detailed review of the facts and history of the case.

Taxpayers seek a deduction from gross income, predicating their case solely upon the provisions of Article 23(m)–16 of Treasury Regulations 94. The drilling and development costs dealt with by this article are those incurred by a taxpayer in connection with the development of his own property or lease. The option granted by the regulation does not extend to costs incurred under turnkey contracts, or to costs which are a part of the costs of a completed well which has by agreement

been drilled quid pro quo as the purchase price of the property or an interest in it. The regulation was not intended to and does not apply to costs incurred in the drilling of oil wells on the lands of others, or to costs incurred in connection with the drilling of wells as the purchase price of or as consideration for an interest in the lands of others. As to the scope of Article 23(m)–16 also see Commissioner v. Ambrose, 5 Cir., 127 F.2d 47, decided April 8, 1942.

■ The ultimate question for decision, therefore, is whether or not the oil wells drilled in this case were drilled as consideration for the assignment of the undivided interests in the oil properties; for if they were drilled as consideration for the assignment, the drilling and development costs are not deductible under the regulation but must be treated as a capital expenditure. The Board found that the drilling of these wells was part of the consideration for the assignments of the interest in the leases, and this court is without authority to disturb that finding since it is supported by substantial evidence.

The petitioners were members of a partnership which acquired interests in two leases. The instrument by which three-fourths of the working interest in the Richter "A" Lease was acquired provided that as part of the consideration for the assignment the assignee would drill and equip an oil well on the property at its sole cost and expense, and that if the well produced as much as one hundred barrels of oil per day, the assignee would drill and equip a second well upon the same terms and conditions. Other provision was made for operation of the property, cost of operation to be paid seventy-five per cent by the assignee and twenty-five per cent by the assignor. That the agreement and obligation to drill the wells was intended as consideration for the assignment of the three-fourths interest in the lease is, we think, made clear by the terms of the instrument itself which provides: "5. As part of the consideration for this assignment and the rights hereby granted, Assignee covenants that it will immediately commence the drilling of a well on the tract of 20 acres last above described, and continue the drilling thereof with due diligence and in a workmanlike manner to the present pay horizon, which is found at approximately 2650 feet, furnish all casing, tanks, flow lines and separator, if necessary, and do all things necessary *to complete said well into the tanks as a turnkey job*. Assignee further agrees that if said well, when completed is capable of producing as much as one hundred (100) barrels per day, after a reasonable test thereof, it will drill a second well on said 20-acre tract, on the same convenants and agreements as are here made with respect to the first well above mentioned." (Italics ours.)

■ Without more, this plain provision in the assignment amply supports and sustains the finding of the Board that the drilling of the wells was consideration for the assignment. Moreover, there is no evidence contradicting or attempting to explain away this clear provision in the instrument.

■■ The Richter "B" Lease transaction was evidenced by a "Development Contract and Escrow Agreement" under which the Richter "B" Lease was placed in escrow to be delivered "in consideration of the covenants and agreements set out in said oil and gas lease". The lease and escrow agreement were to be considered and construed together, and it was provided that wells would be drilled and that the lease would not be delivered until the first well had been completed. Under the terms of the escrow agreement $10,000 was placed on deposit with the escrow agent as a guaranty for full performance of the covenants and agreements. Certainly, these documentary facts support and sustain the Board's findings.

The principles announced in the cases relied upon by the Board are pertinent here and lend weight to its opinion. See State Consolidated Oil Co. v. Commissioner, 19 B.T.A. 86, affirmed 9 Cir., 66 F.2d 648; and United States v. Sentinel Oil Co., 9 Cir., 109 F.2d 854, 856, certiorari denied 310 U.S. 645, 60 S.Ct. 1095, 84 L.Ed. 1412, where there was a stipulation that drilling of wells was "the consideration for the transfer". Here we have no such stipulation, but we do have the instruments of assignment and the Board's specific finding on the point. Furthermore, we think that the decision of the Board is legally and logically sound, with or without reliance on these cases.

The findings of the Board are supported, if indeed not compelled, by the record evidence, and its conclusions and application of the law are correct.

The petition is denied and the decision of the Board is affirmed.

HUTCHESON, Circuit Judge (dissenting).

This is another of the many petitions which have been bringing up for review, the question of the right under Section 23–M–16,[1] to deduct intangible drilling and development costs of oil wells as ordinary business expense. It challenges the finding of the Board that the wells were not drilled as ordinary development operations upon leases owned by the taxpayer, but as part of the purchase price of the leases, and the conclusion of the Board that they are not therefore drilling expenses but a capital outlay in the purchase of property.

Four wells are involved. Two were drilled on the Richter A lease and two on the Richter B lease. The drilling on the Richter A lease was done under these circumstances. One Killian, owner of the $\frac{7}{8}$ths working interest, under an instrument reciting a "consideration of $1.00 and other good and valuable considerations, the receipt of which are hereby acknowledged," assigned to a partnership of which taxpayers were members, $\frac{3}{4}$ths of the working interest, "subject however to the following covenants and agreements": (1) All cost of operation to be paid 75 per cent by assignee and 25 per cent by assignor; (2) assignee shall collect proceeds of minerals produced and remit to assignor for his $\frac{1}{4}$th interest, after deduction, his $\frac{1}{4}$th of operating costs; (3) should his receipts be less than his costs, assignor to remit balance on demand; (4) "as part of the consideration for this assignment and the rights hereby granted", assignee covenanted to commence the drilling of a well to 2650 feet and if that well was a producer, to drill another one on the same conditions.

These are the facts about those drilled on the Richter B lease. There was an ordinary oil and gas lease providing for a primary term and for the continuance of the lease as long as oil and gas is produced in paying quantities, in consideration of the royalties reserved by the lessor and an oil payment of $20,000 out of $\frac{1}{8}$th of $\frac{7}{8}$ths of the first oil produced. Contemporaneous with this lease there was a development contract and escrow agreement providing that the lessee would commence operations for the drilling of a well within 30 days, would drill it to 2650 feet unless oil was sooner encountered and upon furnishing a sworn statement that the first well had been drilled as agreed, the escrow agent should deliver the lease to the lessee. It is further agreed that upon completion of the first well a second well would be drilled. As a guarantee that lessee would perform the agreements, lessee put up $10,000 to be taken down when the agreements have been complied with. Clause 3 of the contract provides: "This contract shall be construed with and as a part and parcel of the oil and gas lease hereinafter mentioned as fully as if this contract were fully incorporated in it."

As to the Richter A lease, the taxpayers insist that the consideration for the interest the partnership acquired was that which normally supports the acquisition of oil leases, the undertaking to develop and pay assignor his retained part of the production. While therefore, the assignment did state that the drilling of the well was "part of the consideration", it didn't state that it was the full consideration and the statement was only by way of saying that the drilling was a necessary step in the delivery of the real consideration, the development of the lease for joint account under the agreement to produce and deliver to assignor, the oil he was entitled to under the $\frac{1}{4}$th interest retained by him. The intangible costs of drilling these two wells like the drilling of any others that might follow, were just as much intangible costs under the option as they would have been if the assignment had merely provided generally for development on joint account without specifying the number of wells to be drilled in such development.

I agree with the principle announced by the Board that the drilling and development costs the option deals with are those incurred as a part of a taxpayer's program for developing his property and that the option does not extend to such costs when they are part of the costs of a completed well which is agreed to be drilled quid pro quo as the purchase price of property or an interest in it, the well for the interest. I think it clear however that the facts of this case do not bring it within the invoked principle. I therefore agree with petitioners in their insistence that the Board's finding and conclusion were wrong, and I dissent from the opinion of the majority affirming them.

---

[1] Treasury Regulation 94, Revenue Act of 1936.

The decisions [2] on which the Board relies for the finding and conclusion do not support them. Turning on their peculiar facts which were quite different in each case from those here, each held that the facts showed that the well in question was drilled as the purchase price of taxpayer's interest, the total expenditure was a capital outlay, a quid pro quo, a well for an interest in the land. So holding, they properly held that the part of the costs which would, if the option applied, have been attributable to intangible drilling and development, could not be separately considered and taken as drilling and development costs but must be considered as merged in and a part of the purchase price as a whole.

In the State Consolidated case the expenditures were made under a contract by the terms of which; petitioner was to drill wells on two lots belonging to the other party to the contract; the proceeds of the operation were to be applied, first to reimbursing petitioner for its expenses in drilling, equipping and operating the wells, second to paying the landowner $1,400; and thereafter petitioner was to receive a deed to the ½ interest in the property which was thenceforth to be jointly operated.

Operating under the contract for 1920–21, petitioner charged the expenses to, and returned them as, accounts receivable. Later a superseding agreement, putting the property on the basis of a ⅛th royalty, having been entered into, petitioner then undertook to amend his 1920–21 returns to charge the intangible drilling and development costs to expenses in the year in which they were incurred, a practice it had already been following in connection with its other projects. The court properly held that this could not be done; that the expenditures in controversy were not made as current expenses under the option but in exchange for a capital asset, an interest in or to be recouped out of the land.

In the Sentinel as in the Consolidated case, taxpayer made a purchase of an undivided fee interest in land, and agreed to drill an oil well on each tract. In order to get the money to drill, taxpayer sold various units or interests in the land and with the proceeds of these sales, drilled among others, one dry hole. The Commissioner claimed that the drilling of the well was the payment of the purchase price for taxpayer's interest in the land and that the

intangible drilling and development costs were not deductible under the option. The district judge found that the consideration for the sale of the land was not the drilling of the oil well but the right to receive a percentage of the proceeds from the production of the well, if any. In other words, its theory was the same as that advanced by taxpayers here and adopted by us, that the taxpayer received the title to the undivided percentage of the fee in exchange for its promise to pay the grantor a percentage of the proceeds from oil produced. This finding was assigned as error, the Commissioner contending that the money expended in drilling the wells was a capital investment, the purchase price paid by it for the conveyance to it of the undivided interest in the fee of the lands upon which the wells were drilled. The circuit court of appeals did not at all disagree with the legal conclusion of the district court, that if the consideration for the conveyance was the promise of the taxpayer to pay grantor his proportion of the proceeds from oil produced, the intangible drilling and development costs could be deducted as expenses. It disapproved the finding of fact that this was so, upon the holding that the text of the agreement between the oil companies and oil owners not being in the record, the court could not "go behind the following, taken from the agreed statement of the case: 'The consideration for the transfer * * * was an understanding between the grantor and the grantee that the latter would proceed to drill an oil well on each tract'". [109 F.2d 856.] Concluding the opinion, declares: "We think this statement compels the conclusion that the drilling costs constituted the purchase price for the undivided interest in the land acquired by appellee and represented a capital investment. The appellee's investment was therefore in the land, and title to that land remained in appellee throughout the taxable year."

Here what occurred was entirely different. The owner of the working interest desiring to secure the development of the property so that he could derive something from his lease, arranged with the partnership to assign it a ¾ths working interest in consideration of developing the property for oil on joint account and paying over to him, after deducting his share of the expenses, the ¼th of the proceeds due him

[2] State Consolidated Oil Co. v. Com'r, 9 Cir., 66 F.2d 648; United States v. Sentinel Oil Co., 9 Cir., 109 F.2d 854, 856.

under the interest that he retained. In order to insure the development, he made definite and express provision for it. instead of leaving it to general provisions or to the implied covenants. These facts do not at all support the finding of the Board that the well was drilled as quid pro quo, the drilling of the well for the assignment of the lease. They show that the real consideration for the assignment was the development on joint account and his getting ¼th of the net proceeds, and that the drilling of the well was provided for not as the consideration for the assignment but as a method of obtaining that consideration.

Whatever question there may be as to the correctness of these views as applied to the Richter A lease, there can be none as applied to the Richter B lease. What occurred there was that the partnership took a lease paying no consideration for it except the agreement to develop it for oil and to pay lessors from the development, their retained royalty and oil payment, and instead of agreeing generally to diligent development or leaving the matter of development to the implied covenants, the parties stipulated that there should be at least two wells drilled.

There is no stipulation that the drilling of these two wells should operate as consideration for the lease or relieve the taxpayer of its obligation to drill other and further wells as development required, nor is there any that the taxpayer should stand as to its ownership or its right in and to them in any different case from that it would stand in as to any other wells drilled under the same lease. There was no provision for reimbursing the taxpayer for the cost as in the Consolidated case. There was no agreement as in the Sentinel case that the drilling of the wells was the consideration for the lease. While therefore, the invoked principle on which the Board acted, that the regulation which allows the option, was intended to apply and did apply to the normal development work done by persons in developing their own properties and did not apply to oil wells drilled on, or as the purchase price of, lands of others, is a correct one, it may not be applied here. For here the drilling was all done on the land of the operator, and not as the consideration for its purchase but in furtherance of the development of the property in order to deliver to the lessors under the B lease and the assignor under the A lease, the real consideration for the lease and the assign-

ment, the proceeds from the development of their reserved interest.

I think the order of the Board, on the issues here discussed, should be reversed and the cause remanded with directions to redetermine deficiencies in accordance herewith, and I therefore dissent from the judgment of affirmance.