**UPSON v. OTIS et al.**

No. 267.

Circuit Court of Appeals, Second Circuit.
April 26, 1946.

As Revised on Denial of Rehearing
May 23, 1946.

Abraham Marcus, of New York City, for plaintiff-appellee.

Spence, Hotchkiss, Parker & Duryee, of New York City (Kenneth M. Spence, of

New York City, and Leo T. Norville, of Chicago, Ill., Julius J. Teller and David B. Tolins, both of New York City, of counsel), for individual defendants-appellees.

Simpson, Thacher & Bartlett of New York City (Robert H. O'Brien and Davis S. Junker, both of New York City, of counsel), for corporate defendants-appellees.

Samuel Marion, of New York City, for appellants.

Before L. HAND, SWAN and FRANK, Circuit Judges.

FRANK, Circuit Judge. 

■ As Automatic had not registered under the Investment Company Act at the time of the occurrence of the transactions covered by the complaint, § 17(a) of that Act has no bearing here.[1] Under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, we must therefore look to New York decisions. It would seem that they follow the usual conflict of laws rule in referring to Delaware "law" to determine the fiduciary obligations of directors of a Delaware corporation.[2]

■ The Delaware decisions are in accord with Irving Trust Company v. Deutsch, 2 Cir., 73 F.2d 121; see Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.2d 503, 511; cf. Bovay v. H. M. Byllesby & Co., Del. Sup., 38 A.2d 808. Whether, on the facts now presented, the individual defendants would have been liable had they bought the Majestic stock from DuMont we need not consider.[3] For Automatic bought that stock from DuMont, and these directors not only bought it from Automatic but borrowed the purchase price from that company. Thus (on the facts as now presented), in the most flagrant and inexcusable manner, they violated their obvious fiduciary obligations. Even if New York internal "law" applied, the directors would be liable in such circumstances. See Blaustein v. Pan American Petroleum Co., 293 N.Y. 281, 56 N.E.2d 705.

■ The Delaware courts, applying to wrongdoing directors the rules of accountability applicable to wrongdoing trustees, hold that a wrongful sale by directors to themselves of property owned by their corporation is treated as a conversion. Consequently, they hold that, where a director has improperly purchased stock from his company and then resold it, the company may elect either to hold the director for the profits he has made or ask a recovery which will restore the company "to the status quo ante as nearly as the facts and circumstances * * * will permit"; if it elects the latter, it may recover "the highest intermediate value of the stock from the time of its conversion up to a reasonable time after knowledge is acquired of the un-

---

[1] § 17(a) is 15 U.S.C.A. § 80a—17(a) which reads as follows:

"Transactions of certain affiliated persons and underwriters. (a) It shall be unlawful for any affiliated person or promoter of or principal underwriter for a registered investment company (other than a company of the character described in section 80a—12(d) (3) (A) and (B), or any affiliated person of such a person, promoter, or principal underwriter, acting as principal—

"(1) knowingly to sell any security or other property to such registered company or to any company controlled by such registered company, unless such sale involves solely (A) securities of which the buyer is the issuer, (B) securities of which the seller is the issuer and which are part of a general offering to the holders of a class of its securities, or (C) securities deposited with the trustee of a unit investment trust or periodic payment plan by the depositor thereof;

"(2) knowingly to purchase from such registered company, or from any company controlled by such registered company, any security or other property (except securities of which the seller is the issuer); or

"(3) to borrow money or other property from such registered company or from any company controlled by such registered company (unless the borrower is controlled by the lender) except as permitted in section 80a—21(b)."

[2] Restatement of Conflict of Laws, § 199; New York Annotations of Restatement of Conflict of Laws (1935) pp. 165, 166; German-American Coffee Co. v. Diehl (No. 2), 86 Misc. 547, 149 N.Y.S. 413, affirmed 168 App.Div. 913, 152 N.Y. S. 1113; Stratton v. Bertles, 238 App. Div. 87, 263 N.Y.S. 466. See also German-American Coffee Co. v. Diehl, 216 N.Y. 57, 109 N.E. 875.

[3] In all probability they would, under the Delaware decisions on the facts now before us. The same would seem to be true under the New York decisions.

lawful act or conversion." Cahall v. Burbage, 14 Del.Ch. 55, 121 A. 646, 649.

So far as appears on this record, the improper purchases by the directors of the Majestic stock from Automatic seem to have occurred in Delaware; if so, the Delaware rule as to damages applies. But it might be urged that, as the evidence concerning the place of those purchases is not clear, we should assume that they occurred in New York. Were that true, probably the New York courts would follow Delaware in treating those purchases as conversions, on the ground that the law of the place of incorporation determines the nature of the wrong; but, since the wrongs occurred in New York, the New York rule of damages in conversion cases would control. That rule, however, is the same as Delaware's. Baker v. Drake, 53 N.Y. 211, 13 Am.Rep. 507; Griggs v. Day, 158 N.Y. 1, 22, 52 N.E. 692; Mayer v. Monzo, 221 N.Y. 442, 117 N.E. 948. We reach the same result if we assume that the New York courts would apply New York internal "law" in determining the nature of the wrong. For New York, like Delaware, treats directors, for most purposes, as trustees; Continental Securities Co. v. Belmont, 206 N.Y. 7, 16, 99 N.E. 138, 51 L.R. A.,N.S., 112, Ann.Cas.1914A, 777; People ex rel. Manice v. Powell, 201 N.Y. 194, 201,

94 N.E. 634; and conduct by a trustee, similar to that of the directors here, is held in New York to call for damages as on a conversion. People ex rel. Manice v. Powell, supra; Hart v. Ten Eyck, 2 Johns.Ch. 62, 115, 116; Mooney v. Byrne, 163 N.Y. 86, 96, 97, 57 N.E. 163.

One way or another, then, the critical question is the date when a "reasonable time" began to run. Clearly here it ran from the time when Automatic was first able to take steps, independent of the domination of the individual defendants, to go into the market to purchase the number of shares unlawfully acquired and resold by those defendants. As the market price rose after the resales by those defendants and as the price rise occurred when Automatic was not free of the domination of these defendants,[3] Automatic would plainly be better off to elect to ask for recovery on the basis of the "highest intermediate value" rather than for the profits made by those defendants. We reject the suggestion that, if these defendants had not dominated Automatic, it might, at some earlier date, have sold the Majestic stock as the result of disinterested business judgment; since the misconduct of defendants renders it impossible to ascertain whether Automatic would have done so, they may not assert that it would or might.[5] It follows

---

[3] We leave open, for determination in the district court, the date when Automatic can be said to have been free of such domination.

[5] Bigelow v. RKO Radio Pictures, Inc., 66 S.Ct. 574; Package Closure Corp. v. Sealright Co., 2 Cir., 141 F.2d 972, 979.

In the Bigelow case, supra [66 S.Ct. 580], the Supreme Court said: "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. See Package Closure Corp. v. Sealright Co., 2 Cir., 141 F.2d 972, 979. That principle is an ancient one, Armory v. Delamirie, 1 Str. 505, and is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application. In cases of collision where the offending vessel has violated regulations prescribed by statute, see The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148, and in cases of confusion of goods, Great Southern Gas & Oil Co. v. Logan Natural Gas & Fuel

Co., 6 Cir., 155 F. 114, 115; cf. F. W. Woolworth Co. v. N. L. R. B., 2 Cir., 121 F.2d 658, 663, the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable. And in cases where a wrongdoer has incorporated the subject of a plaintiff's patent or trade-mark in a single product to which the defendant has contributed other elements of value or utility, and has derived profits from the sale of the product, this Court has sustained recovery of the full amount of defendant's profits where his own wrongful action has made it impossible for the plaintiff to show in what proportions he and the defendant have contributed to the profits. Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co., 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222, 41 L.R.A.,N.S., 653; Hamilton-Brown Shoe Co. v. Wolf Brothers & Co., 240 U.S. 251, 36 S.Ct. 269, 60

that, on the facts presented to the district judge, the liability of the individual defendants was indubitable and the amount of recovery beyond doubt greater than that offered in the settlement. Accordingly, it was an abuse of discretion to approve the settlement. This conclusion relates not only to the individual defendants other than Tracey but also to 31,500 of the shares bought by Tracey.

■ As to the other 40,000 shares which Tracey and his wife purchased, the situation is somewhat different. As, on the facts now presented, Tracey surrendered his option, previously obtained from DuMont, on 40,000 shares, in order to enable DuMont to sell to Automatic, there would have been no wrong, had he received from Automatic an option on 40,000 shares on the same terms as the surrendered option, i.e., at an average of $2.25 per share. He did receive such an option from Automatic as to 10,000; with respect thereto he is not liable. But the remaining 30,000, he bought from Automatic at a price of $1.20 per share. Consequently, on those shares, he made an unlawful profit of $1.05 a share or $31,500. As he showed no defense against that liability, to that extent the approval of the settlement also constituted an abuse of discretion.

Since the release which Tracey was to receive was not to be a general release, it would have had no effect on any claims against him with respect to the other options to which appellants refer; accordingly, we need not here consider the effect of the S. E. C. exemption order, which expressly excepted the transactions alleged in Upson's complaint. As the S. E. C. suit did not terminate in a decree on the merits, we need not consider whether, if it had, it would have barred recovery in the instant suit. Nor need we on this appeal explore the issue whether Automatic's sale of assets, the proceeds of which were used to buy the Majestic stock, was wrongful, and,

if so, whether Majestic sustained resultant recoverable damages.

The district court's order must be vacated, with the consequence that the action will proceed as if no settlement had been offered. In the circumstances, appellants should be permitted to intervene.

Reversed and remanded.

On Petitions for Rehearing

PER CURIAM.

1. In their petitions for rehearing, the individual defendants state that "the theory of liability and the measure of damages adopted by this court was neither briefed nor argued in this court or below by any of the counsel in the case." But the fact is that, in the court below, counsel for appellants argued that these defendants were liable "on the theory of conversion," and in his brief here cited cases based on that theory. Counsel for plaintiff-appellee in his brief filed in this court, describing appellants' argument, said, "Basis for such rule of damage was stated to be 'on the theory of conversion,'" and then proceeded for several pages to discuss decisions relating to "conversion of stock."

2. These defendants also object that in our opinion we said that they acquired the Majestic shares from Automatic; all the Majestic shares bought by these defendants, they now assert, were bought by them directly. Our version of the facts was based on the record as interpreted by and with the acquiescence of these defendants.

The record consists of (a) plaintiff's amended complaint, (b) a notice of the proposed settlement, (c) the proposed settlement, (d) affidavits, filed below, with attached exhibits, and (e) oral statements of counsel in the hearing in the district court, which preceded that court's order. That complaint, which is verified, explicitly states that Automatic had acquired the shares and sold them to these defendants;

L.Ed. 629; see also Sheldon v. Metro-Goldwyn Corp., 309 U.S. 390, 406, 60 S.Ct. 681, 687, 84 L.Ed. 825. * * * Any other rule would enable the wrong-doer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to

preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery." See also Griggs v. Day, 158 N.Y. 1, 20, 52 N.E. 692.

plaintiff's counsel so stated in an affidavit filed below. In a colloquy in the district court hearing, he made the following statement of the facts on which the settlement offers were based:

"Mr. Marcus: Thereafter the transaction occurred which is the subject of complaint in this first transaction and that is, Automatic was caused to purchase these securities and option from DuMont. * * *".

"The Court: I see. The transaction did go through?"

"Mr. Marcus: It did go through but apparently not entirely for the benefit of Automatic. * * *"

"The Court: That money was paid by Automatic?"

"Mr. Marcus: That money was paid by Automatic. And that occurred somewhere about the end of April or the beginning of May, 1943. The 194,000 shares were taken in and the defendants Otis and Franklin and their co-directors allotted 102,500 shares out of that 194,000 shares to themselves, their wives and associates. So that the 102,500 shares were diverted from Automatic to these individuals. * * *"

"The Court: At which point did the diversion take place? Before or after the consummation of the transaction?"

"Mr. Marcus: The transaction with DuMont was consummated and I believe it was simultaneously that these shares were allotted to the individuals by Automatic."

In his brief in this court, counsel for plaintiff-appellee repeated the allegation of the complaint and, in explaining the amounts offered in settlement, said, "Since stocks acquired by the defendants from others than Automatic were also sold by them, the calculation was based on the price of all the stocks sold by the defendants during the period there involved,"

which plainly meant that the shares in question here were acquired by the defendants from Automatic.

In their brief filed in this court, these defendants did not challenge the statements of counsel for plaintiff-appellee, nor did they suggest that the allegation of the complaint, as to their purchases from Automatic, was incorrect.[1]

Thus this appeal was argued with the record facts interpreted by the parties to mean that Automatic bought 192,909 Majestic shares,[2] and simultaneously sold to the individual defendants 102,500 of the shares thus acquired. The fact that, as stated by plaintiff's counsel to the court below, the transactions were simultaneous, explains the fact, indicated by exhibits in the record,[3] that stock certificates for 102,-500 Majestic shares were transferred directly into the names of these defendants and their designees. Of course, if Automatic bought these shares and sold them to the defendants, it is immaterial that there were no formal transfers of the certificates into the name of Automatic; sales of shares are often made without such formal transfers.

In support of their contention, made in their petitions for rehearing, that these defendants acquired no Majestic shares from Automatic, they now stress an exhibit containing an extract from the minutes of a meeting of the Automatic Board of Directors held April 20, 1943, which stated that the company "had been given the opportunity to acquire, as part of a group," from DuMont, the 192,909 shares and that those shares "had been subscribed for by the undermentioned persons for payment on or before November 30, 1943"; there follows a list of "Subscriptions For Shares" which shows "subscriptions" for 102,500 shares by these defendants, 25,000 shares by Automatic, and other shares by

[1] Although these defendants now tell us, in their rehearing petitions, that that allegation was erroneous in that it deviated from that contained in the complaint in the S. E. C. action (not in the record), counsel for these defendants, referring to plaintiff's complaint, had told the district court, "It is a copy of the S. E. C. complaint," and in their brief here said the allegations of the two complaints were "substantially the same."

[2] 100,000 of these shares were acquired through the exercise of an option which was bought from DuMont as part of the transaction.

[3] We have, of course, disregarded non-record matter contained in affidavits filed in this court in connection with the rehearing petitions.

Allied and B. T. I. Defendants now contend that this exhibit demonstrates that Automatic acquired merely 25,000 shares, and that the individual defendants acquired their Majestic shares directly, borrowing the needed funds from Automatic. But another extract from the minutes of the same meeting states the following: *"The stock acquired by this corporation from the DuMont interests is subject to an option to E. A. Tracey to purchase 20,000 shares at $2 per share, and 20,000 shares at $2.50 per share."* [4] Obviously, if Automatic itself acquired only 25,000 shares, that acquisition was not subject to options on 40,000 shares. The explanation of these minutes would seem to be that given by plaintiff-appellee's counsel in the district court, i.e., the acquisition by Automatic and the resales by it to these defendants occurred simultaneously.

3. We have not decided this appeal as if it were from a judgment on the merits. We have merely considered whether, on the facts presented to the court below, when it was asked to approve the settlement, there was sufficient doubt, in the light of the pertinent legal rules, about the liability and amount of damages to justify its approval order. In the district court, plaintiff and the defendants may now offer further proof in support of the settlement and then again ask for approval; or they may tender a different settlement for approval. In the alternative, they may seek judgment on the merits; any resulting decision will, of course, then turn on the correct legal rules applicable to the facts thus established. [5]

If they should seek approval in the district court of the present offers, or some others, they should have this in mind: (1) A record consisting in considerable part of colloquies between counsel and the judge is never satisfactory, [6] as we have several times advised the bar. [7] Indeed, on that ground alone we might have refused to affirm here. (2) Where court approval is asked of settlement of a suit by beneficiaries against fiduciaries, far more than a slight indication of doubt as to the likelihood of successful recovery in full against them is required; for equity closely scrutinizes settlements between fiduciaries and cestuis, [8] and, were the suit to go to trial, the fiduciaries would usually bear a heavy burden of proof as to all crucial issues. [9] To justify judicial sanction of such a set-

---

[4] Emphasis added.

[5] A letter to this court from the Solicitor of the S. E. C. states that B. T. I., at the time of the transactions in question, was registered as an investment company under the Investment Company Act. But, as that fact is not in the record, we cannot consider what, if proved, its legal effect would be.

[6] To illustrate: Here the alleged fact that DuMont insisted on the release of Tracey's option as a condition precedent to the sale rests on statements by counsel in the district court and a statement in the notice of settlement. We note in passing that even those statements are ambiguous, being open to the construction that DuMont insisted on the release only as a condition precedent to the sale of the 40,000 shares under option to Tracey, not to the sale of the balance.

[7] In re Syracuse Stutz Co., Inc., 2 Cir., 55 F.2d 914, 917; In re National Public Service Corp., 2 Cir., 68 F.2d 859, 861; In re Adolf Gobel, Inc., 2 Cir., 80 F.2d 849, 853; Syracuse Engineering Co. v. Haight, 2 Cir., 97 F.2d 573, 575; Royal Petroleum Corp. v. Smith, 2 Cir., 127 F.2d 841, 843.

In Re Syracuse Stutz Co., supra [55 F. 2d 917], we said: "In conclusion we wish to express our thorough disapproval of the manner in which this record on appeal is made up. Fully one-third of it embraces so-called 'Minutes,' apparently a stenographic report of the colloquy between court and counsel at the hearing. Such a colloquy has no place in an equity record."

In Royal Petroleum Corp. v. Smith, supra [127 F.2d 843], we said: "If in the rambling discussion anything 'essential' had appeared, it should have been selected and put in such form as to be comprehensible. We cannot undertake to grope our way through a heap of rubbish on the odd chance of picking up a bit of sound metal here and there."

[8] Cf. Adams v. Cowen, 177 U.S. 471, 484, 20 S.Ct. 668, 44 L.Ed. 851; Ingram v. Lewis, 10 Cir., 37 F.2d 259, 263, 70 A. L.R. 702; Comstock v. Herron, 6 Cir., 55 F. 803, 810.

[9] Thus, if we assume that, in connection with a renewed effort to procure approval of the settlements, it should satisfactorily be shown below that the individual defendants bought no Majestic shares from

tlement, the fiduciaries must make a fairly detailed disclosure of the evidence which, on a trial, they would use defensively.[10]

Petitions for rehearing denied.

Automatic, then an issue as to lost business opportunity would arise. These defendants assert that in the district court enough has already been shown to raise ample doubt in their favor on that issue. We do not agree. All that was there shown was that Automatic and its affiliates already owned a very considerable block of Majestic stock. Defendants, in their petitions for rehearing, add a reference to Gluck v. Otis, 265 App.Div. 244, 38 N.Y.S.2d 541; in the opinion in that case it appears that B. T. I. and affiliates in 1937 to 1939 had invested in securities, including some Majestic shares, and that these investments as a whole had been unprofitable; but the opinion does not disclose to what extent the Majestic shares shrank in value, and states that, by 1940, the investments had become profitable. Such facts alone we regard as insufficient to raise the needed doubt.

[10] Cf. Cohen v. Young, 6 Cir., 127 F.2d 721; Winkelman v. General Motors Corp., D.C., 48 F.Supp. 490, 496.