## KING OIL CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 11316.

Circuit Court of Appeals, Fifth Circuit.

Feb. 18, 1946.

WALLER, Circuit Judge, dissenting in part.

———————◇———————

Harry C. Weeks, of Fort Worth, Tex., for petitioner.

Robert N. Anderson, Helen R. Carloss, and Maryhelen Wigle, Sp. Assts. to Atty. Gen., Sewall Key, Acting Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and Bernard D. Daniels, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before McCORD, WALLER, and LEE, Circuit Judges.

LEE, Circuit Judge.

When petitioner, a Delaware corporation,[1] filed its income and excess profits tax return for the calendar year 1939, it deducted from gross income,[2] as ordinary and necessary business expense, intangible costs incurred in the drilling and development of wells on certain leasehold properties in Texas as follows:[3]

| Name of Lease | Well No. | Claimed Deductions |
|---|---|---|
| Waggoner "N" | 9 | $ 3,977.08 |
| Crudup | 6 | 6,882.29 |
| Waggoner "R" | 7 and 8 | 4,497.05 |
| King-Waggoner | 3 | 5,895.79 |
| Rathke | 3 | 3,612.96 |
| Wigley | 4, 5, 6 and 7 | 46,734.03 |
| J. & J. Waggoner | 1 | 12,484.28 |

The Commissioner held the claimed deductions to be capital expenditures and disallowed them as expenses. The Tax Court upheld the Commissioner, and petitioner brought the controversy to us for review.

The question presented is whether the intangible drilling and development costs were ordinary and necessary business expenses, deductible under the regulations,[4]

---

[1] Petitioner's principal office was in Wichita Falls, Texas. It was engaged in developing oil properties and producing oil.

[2] In taking this deduction petitioner followed its previous election.

[3] Petitioner has abandoned its claim with respect to the wells on the Crudup and Rathke leases, and we are only concerned with the wells on the remaining leases.

[4] Applicable statute and regulations:
Internal Revenue Code:
"Sec. 23 Deductions from gross income.
"In computing the net income there shall be allowed as deductions:
"(a) Expenses.
"(1) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable

or capital expenditures, part of the consideration for the leases, not deductible.

Neither the amounts expended as intangible costs nor the facts as to the development are in dispute. The petitioner's attack is directed against the finding of the Tax Court that the amount expended by the taxpayer in drilling each well "was part of the consideration for the assignment of the interest in the oil properties," and its conclusion that the amount so expended was capital expenditure.

The petitioner is lessee under the Waggoner "N" lease of December 9, 1935, covering 320 acres and under the Waggoner "R" lease of November 31, 1936, covering 80 acres, and assignee under the King-Waggoner lease of October 14, 1937, covering 320 acres.[5] The three leases, identical in form and differing only as to the acreage covered, provide:

"As a part of the consideration hereof the Lessee covenants and agrees and binds himself to begin actual drilling of a well on said premises within 30 days from date hereof, and to prosecute the drilling thereof with due diligence to a depth of 2400 feet, unless oil or gas is found and produced and saved at a lesser depth.

"If no well be begun hereon, as above provided, or if a well is begun and the drilling is not prosecuted with due diligence, as herein provided, or if said well should be abandoned, (failure to drill for as much as 30 days at any one time, shall be an abandonment) then this lease shall immediately become null, void and of no effect and shall automatically revert to the

---

allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * *

"(m) Depletion. In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * *

"(n) Basis for depreciation and depletion. The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be as provided in section 114."

26 U.S.C.A. Int.Rev.Code, § 23(a) (1), (m, n).

Treasury Regulations 103, promulgated under the Internal Revenue Code:

Sec. 19.23(m)-16 [as amended by T.D. 5276, 1943 Cum.Bull. 151]. Charges to capital and to expense in case of oil and gas wells.—(a) Taxable years beginning prior to January 1, 1943.—The provisions of this subsection apply only to taxable years beginning prior to January 1, 1943.

(1) Items chargeable to capital or to expense at taxpayer's option:

(i) Option with respect to intangible drilling and development costs in general: All expenditures for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas, may, at the option of the taxpayer, be deducted from gross income as an expense or charged to capital account. Such expenditures have for convenience been termed intangible drilling and development costs. Examples of items to which this option applies are, all amounts paid for labor, fuel, repairs, hauling, and supplies, or any of them, which are used (A) in the drilling, shooting, and cleaning of wells; (B) in such clearing of ground, draining, road making, surveying, and geological work as are necessary in preparation for the drilling of wells; and (C) in the construction of such derricks, tanks, pipe lines, and other physical structures as are necessary for the drilling of wells and the preparation of wells for the production of oil or gas. In general, this option applies only to expenditures for those drilling and developing items which in themselves do not have a salvage value. For the purpose of this option labor, fuel, repairs, hauling, supplies, etc., are not considered as having a salvage value, even though used in connection with the installation of physical property which has a salvage value. Drilling and development costs shall not be excepted from the option merely because they are incurred under a contract providing for the drilling of a well to an agreed depth, or depths, at an agreed price per foot or other unit of measurement.

5 All three leases were executed by the W. T. Waggoner Estate, the first two to petitioner and the last to Edwin S. Smith, Jr., and was by him assigned to the petitioner.

Lessor herein without the action of any court.

"Provided, however, in case a well is abandoned, and the next well shall be drilling within 20 days from abandonment of the former well, the Lessee shall have 60 days from the completion of one well in which to begin the actual drilling of another well, such well to be prosecuted with due diligence and to be under the same conditions, requirements and limitations as the first well mentioned herein. And the Lessee shall and will continue to dig additional wells on said tract, each succeeding well to be begun within 60 days from the completion of the preceding well, and to be drilled under the same conditions, requirements and limitations as provided for the first well, until the Lessee shall have dug a well on each twenty acres herein, the well for a center. Only producing wells shall hold twenty acres in a square form, the well for a center, for the time herein specified."

T. J. Waggoner and J. L. Waggoner executed on November 19, 1937, the J. & J. Waggoner lease,[6] covering 244.35 acres of land. The pertinent stipulations therein follow:

"Witnesseth: That for valuable consideration to lessor, in hand paid by Lessee, receipt whereof is hereby acknowledged. and of the covenants and agreements hereinafter contained on the part of lessee to be paid kept and performed, and subject to the conditions and reservations hereinafter set out, have granted, demised, leased and let and by these presents do grant, lease, and let unto the said lessee, for the sole and only purpose of mining and operating for oil and gas and of laying pipe lines and of building tanks, powers, [sic] stations and structures thereon to produce save and take care of said products, all that certain tract of land situated in the county of Wichita, State of Texas, described as follows, to-wit:

.*   *   *   *   *

"It Is Agreed, that this lease shall remain in force for a term of three years from this date. If at the end of such three year period the lessee is then engaged in drilling a well on said premises, this lease shall continue in force as to all of said land so long as such drilling continues, and, such drilling shall be considered as being continuous so long as no more than six months elapses between the completion of one well, either as a commercial producer or a dry hole, and the commencement of a subsequent well. Whenever twelve wells have been drilled on said leased premises, no further obligation for drilling on said premises shall be required except to protect the same from off-set drainage on lands owned by persons other than lessors. However, if drilling operations have ceased, or when drilling operations cease after the expiration of such three years primary term and if twelve wells have not theretofore been drilled either as producers or as dry holes, then this lease shall continue in full force and effect as to all wells then producing oil and/or gas so long as any such wells so produce, but only as to 20 acres for each such well so drilled such 20 acres for each well to be selected and designated by the lessee so as to include all of said wells. The lease, however, shall terminate at the end of three years or upon the cessation of drilling operations thereafter prior to the completion of twelve wells, as to all of said land except 20 acres for each such well to be designated by the lessee in the manner above set out."

The three Waggoner Estate leases provided that each producing well drilled will hold 20 acres in a square with the well as the center; the J. & J. Waggoner lease differs only in that it permits the lessee to select the 20 acres around the well. Petitioner, however, contends that the 320 acres in the Waggoner "N" lease cover an irregular area, and that at the commencement of well No. 9 four producing wells were within the limits of the Northeast Quarter, containing 80 acres. It admits that the 20-acre square with well No. 9 as the center would not include any of the prior wells drilled, and that at most the 20-acre square would overlap by 273-⅓ feet the 20-acre square with well No. 8 as the center. It also admits that the 20-acre square around well No. 8 would include the locations of three other producing wells on the Northeast Quarter. Five producing wells and one dry hole were drilled on the Waggoner "R" 80-acre lease prior to 1939,

---

6 It contained the usual provisions as to royalties and delay rentals. A delay rental was paid at the end of the first year, and on February 12, 1939, petitioner began its No. 1 well and completed the same on March 18, 1939, as a good oil producer.

but the wells were not so located as to place a well on each 20 acres with "the well for a center" as required by the lease. Twenty acres in a square with well No. 5[7] as the center includes the locations of wells No. 7 and No. 8, drilled in 1939. The two 20-acre squares with wells No. 7 and No. 8 as their centers include acreage not within the 20-acre squares around wells previously drilled. Two producing wells were drilled on the King-Waggoner 320-acre lease prior to 1939. A 20-acre square around well No. 3 drilled in 1939 includes acreage not embraced by the other two wells. Each well drilled by petitioner in 1939 on the premises covered by the Waggoner Estate leases extended to petitioner, by the terms of the leases, a new right—security against loss of the well drilled and accompanying acreage, or security against loss of accompanying acreage. Under similar provisions in the J. & J. Waggoner lease the drilling of well No. 1 vested petitioner with the right to hold the well and 20 acres to be selected by it around the well.

S. W. Wigley, acting individually and as community administrator of the community estate of himself and his deceased wife, on June 30, 1937, executed the Wigley lease covering 160 acres of land.[8] It was what is known as the ordinary commercial lease. The duration of the term was five years and as long thereafter as oil or gas might be produced. Only the commencement of a well or the payment of a $160-delay rental in lieu thereof, prior to the end of each of the primary years, would prevent the termination of the lease.[9] After completion of the first well on January 28, 1938, producing three to four hundred barrels of oil per day, dissatisfaction was voiced by Wigley's five daughters. As a result, Wigley, his daughters, their husbands, and petitioner executed a new instrument on March 3, 1938, reading in part as follows:

"Know All Men By These Presents: That we, * * * [S. W. Wigley and the five daughters joined by their husbands] * * * for valuable consideration to us in hand paid by King Oil Company, receipt whereof is hereby acknowledged, and the further consideration of the agreements hereinafter contained on the part of King Oil Company to be kept and performed have Granted, Demised, Leased and let the 160 acres described in said lease of record in Vol. 345 at page 337 of said Deed Records in strict accordance with all of the terms and provisions of said original lease as modified by this agreement.

"To Have And To Hold, said land unto the said King Oil Company, according to the terms of said original lease as modified by this agreement, and we each jointly and severally bind ourselves, our heirs, executors and administrators to Warrant and Forever defend title to said property and to save harmless King Oil Company, its successors and assigns, from any defect in title thereto, so that from and after delivery of this instrument no attack upon the validity of the lease hereby expressed, shall be made except upon failure of King Oil Company to observe the provisions of this instrument.

"In consideration of the premises, King Oil Company agrees that it will reasonably begin and with due diligence prosecute the drilling of additional wells upon said 160 acres of land so that within two years from this date it will have drilled six additional wells on said 160 acres of land unless in the course of such drilling program a dry hole is completed to the present producing horizon. If such dry hole is drilled then the said King Oil Company, shall be relieved of further drilling thereafter until an additional well is necessary to off-set a commercially producing well on adjacent land. It is contemplated that the wells so to-drilled [sic] shall be drilled three on or before the expiration of the first year and the remaining three on or before the expiration of the second year. However, this agreement shall not relieve King Oil Company, its successors and assigns, from the obligation to use due diligence in off-setting wells on adjacent land within a reasonable time."

Petitioner paid each of the daughters $320 in connection with the execution of this instrument but paid nothing to S. W. Wigley. In 1939 petitioner drilled wells No. 4, No. 5, No. 6, and No. 7.

■ This court has held that drilling costs of a well resulting by the term of a

---

[7] One of the five producing wells drilled prior to 1939.

[8] The lessee paid $2400 cash consideration.

[9] In addition the lease contained the usual provisions of royalty, warranty, and assignment.

lease in the acquisition of oil property or a better and more extensive interest in it were capital investments, and that no part of its costs was an expense of the business. F. H. E. Oil Co. v. Commissioner, 5 Cir., 147 F.2d 1002; and Id., 5 Cir., 149 F.2d 238. See also Hardesty v. Commissioner, 5 Cir., 127 F.2d 843; Hunt v. Commissioner, 5 Cir., 135 F.2d 697. In the words of the Tax Court:

"* * * It is apparent * * * that each of the wells involved herein was drilled as part of the consideration for the assignment of the interests in the oil properties. In some of the leases the drilling was expressly stated to be part of the consideration. * * * In others the drilling was necessary to avoid termination of the lease in part or in whole."

The Wigley lease, while presenting a somewhat different contractual situation from that presented by the Waggoner leases, involves with respect to the issue before us the application of the same legal principle. Petitioner contends that the instrument which modified the original lease concerned development and did not concern the validity of the lease, but the modification instrument, after referring to the original lease, expressly recites:

"* * * certain questions have been raised with respect to the validity of said lease above described and it is the desire of all parties to remove all such questions in the interests that such lease may be properly and adequately developed and that therefrom there may result benefits to all parties flowing from such development and the settlement of all such questions."

The failure of Wigley, the father, to question the validity of the lease, his failure to attack petitioner's title under the original lease, and the absence of a money consideration being paid to him for the execution of the subsequent instrument are all irrelevant. Petitioner's signature on the modifying instrument was its assent to a new and different contract. The obligation assumed by petitioner to drill six wells was part of the consideration for the execution of the amending instrument, which reinforced the validity of the original lease. Since the obligation on petitioner necessitated drilling expenditures, those expenditures became a capital investment rather than an expense.

Hunt v. Commissioner, 5 Cir., 135 F.2d 697, relied on by petitioner, held that where a lessee acquired one half of his interest free of any drilling obligation and one half subject to drilling obligation, he may charge one half of his intangible drilling costs off to expense. The drilling obligation assumed by petitioner in the amendment to the Wigley lease applied to the entire mineral interest and distinguishes the instant case from Hunt v. Commissioner.

We find no fault with the decision of the Tax Court, and it is, therefore, affirmed.

WALLER, Circuit Judge (dissenting in part).

The original lease executed by S. W. Wigley as community administrator was not a lease in which the drilling of the well was a part of the consideration. Although Wigley's daughters were dissatisfied with the lease, there is no showing in this record that the lease was invalid, either as to Wigley or as to his daughters. Moreover, it does not appear that Wigley ever questioned, or that he could have questioned successfully, the validity of the leases which he had executed, of which he, individually, was the owner of an undivided one-half interest. In the absence of a showing that the original lease was invalid, it does not appear that the second, or supplemental, lease agreement did anything more than settle a controversy. The lessee had already struck oil on the lands and the fact that it agreed, in the supplemental agreement, to drill six more wells is not shown to have been anything more than it would have done without the agreement. If the first lease, which did not require the drilling of a well as a part of the consideration, was valid—and it is not shown to be otherwise—then the making of a compromise, or supplemental, agreement in appeasement of the daughters of Wigley would not change the legal effect of the first lease, nor make it a lease executed in consideration of an agreement to drill whereby oil rights or additional oil rights were obtained or enlarged.

I, therefore, do not concur in that part of the majority opinion relating to the Wigley lease.